THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES M. OSTROWSKI, Defendant-Appellant.

Second District    No. 2—07—1095

Opinion filed August 18, 2009.

O'MALLEY, J., concurring in part and dissenting in part.

James K. Leven, of Chicago, for appellant.

John A. Barsanti, State's Attorney, of St. Charles (Lawrence M. Bauer and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, James M. Ostrowski, was convicted after a bench trial of one count of aggravated criminal sexual abuse (720 ILCS 5/12—16(b) (West 2006)) and one count of resisting a peace officer (720 ILCS 5/31—1(a) (West 2006)) and sentenced to 36 months' probation. On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt on both counts. We reverse the aggravated-criminal-sexual-abuse conviction and affirm the resisting-a-peace-officer conviction.

On August 9, 2006, defendant was indicted with eight counts of aggravated criminal sexual abuse (720 ILCS 5/12—16 (West 2006)) and one count of resisting a peace officer (720 ILCS 5/31—1(a) (West 2006)) after an incident that occurred on July 29, 2006, at the Sugar Grove Corn Boil Festival. The indictment alleged that defendant kissed his four-year-old granddaughter, L.R., on the lips for the purpose of sexual gratification or arousal. The matter proceeded to a bench trial on February 7, 2007. The following facts are derived from the evidence adduced at trial.

L.R., age five at the time of trial, took the stand but was unable to answer many questions, causing the trial court to find her incompetent to testify. Theresa R., L.R.'s mother and defendant's daughter, testified next. Theresa resided in Sugar Grove with her husband and two daughters. In late May 2006, she asked defendant to live with her and help her with L.R. because she was on bed rest due to a high risk pregnancy. Defendant cooked for L.R. and helped her with daily tasks, such as getting dressed. He also helped take care of the home. Theresa observed defendant's relationship with L.R. and found that they got along very well. L.R. followed defendant around everywhere and enjoyed defendant's company. L.R. was affectionate with defendant and kissed him only on the lips. Theresa testified:

"Q. Was [L.R.] affectionate towards your father?
A. Yes.
Q. Can you describe what you mean by that?
A. She would, without question, give him a hug, give him a kiss.
Q. When she kissed him, did she kiss him on the lips?
A. That is how my daughter kisses everybody, at least immediate family. That is the only people she does kiss. She knows she's not to kiss anyone else outside of who she knows and who we know.

Q. So when I asked the question about kissing her grandfather, that would always be on the lips?

A. Absolutely. Just as she would kiss me, just as she would kiss her father, that's just what she knows."

Theresa acknowledged that defendant was an alcoholic and she told him he was not allowed to drink while with L.R. He followed that rule at all times, except when he was with L.R. at the Sugar Grove Corn Boil in late July 2006. The Sugar Grove Corn Boil took place a few blocks from their home. Defendant walked there with L.R., who was in her toy Jeep, to watch the fireworks display. They left the home around 8:30 p.m. Theresa next saw L.R. at 10 p.m. when police took her to L.R. Theresa testified that when she saw L.R. that night she was "doing very well."

Margaret King testified next. On July 29, 2006, Mrs. King arrived at the Sugar Grove Corn Boil around 5 p.m. She and her husband set up their lawn chairs close to where the bands were playing on a temporary stage. She testified that she was "not a great judge of distance" and that their chairs were "maybe 100 feet, 150 feet" from the stage. She reiterated that she was "not great on distance." After counsel provided Mrs. King with a visual marker in the courtroom, counsel noted that she was 50 or 60 feet away. Around 9:30 p.m. the fireworks display began, and it ended around 9:50 p.m. After the fireworks ended, she saw defendant and L.R., if the visual marker in the courtroom was 50 or 60 feet away, approximately 30 feet in front of her. Lawn chairs and people were between Mrs. King and defendant but she had a clear view of him. Her husband, William King, was not with her at the time. Defendant was wearing jeans and no shirt. Defendant appeared intoxicated, had lost his ability to stand, and was lying down. L.R. was rolling on defendant, and at times, he was rolling on her. She testified that "they were at one point kissing." Defendant attempted to stand at times but was unsuccessful. She saw defendant "stagger and [she] saw him fall, and [she] saw him try to get up and be unsuccessful." This went on for about 10 minutes. Mrs. King then saw defendant kiss L.R. on her lips while they were lying next to each other. Mrs. King specifically testified:

"Q. And do you remember the relationship, between the man and the woman—or, I'm sorry, the man and the girl at that point in time? Were they sitting, standing, one on top of the other?

A. They were laying [sic] next to each other.

Q. They were laying [sic] next to each other at that point in time. And you said that the man initiated the kiss. Could you describe for the Court the kiss that you saw?

A. It lasted probably 4 to 5 seconds, and I wasn't close enough to—you know, I wasn't right there, but it lasted for 4 to 5 seconds and they were, you know, appeared to be—

Q. The man had his lips on the young girl's lips for 4 to 5 seconds?

A. Girl's lips.

Q. Were the lips just together and no movement, or was there any movement?

A. I would say a little movement."

Next, Mrs. King testified that she left the scene to get her husband, who was a Corn Boil committeeman, and to have him inform security. She was away for approximately two minutes. When she returned with her husband, there were two police officers observing the situation. Mrs. King looked back toward defendant and L.R. and saw defendant kiss L.R. again. It was another four- to five-second kiss. She specifically testified:

"Q. Describe for the Court what you saw at that point in time.

A. I saw the man kissing her again.

Q. Describe the kiss or those kisses. Was it more than one or just one kiss, if you can remember at that point?

A. I would say one.

Q. And how long would you say that kiss lasted?

A. Again maybe 4 to 5 seconds.

Q. And you described the earlier kiss. Was this kiss different?

A. Similar.

Q. Similar?

A. Very similar."

Within "less than a minute," the police then went and handcuffed defendant. The police had to help defendant stand up to handcuff him. When asked to clarify how many kisses she observed upon returning with her husband, Mrs. King testified:

"A. To be perfectly honest, I was so relieved that the police were there, I just couldn't even watch anymore, so I watched quickly and then it was upsetting."

When asked what position she saw defendant and L.R. in during the second kiss, Mrs. King testified that "they were laying [sic] next to each other." On cross-examination, Mrs. King explained that when she returned, she watched defendant and L.R. for maybe 30 seconds then turned away. She was not sure whether defendant was in handcuffs when she turned back. She admitted that there were a lot of people around; some people were standing up, and some were seated in chairs.

William King testified as follows. Mr. King worked all day at the Corn Boil and stated that the fireworks display started at 9:30 p.m. and lasted for 18 to 22 minutes. Mr. King was inside the school during

the fireworks display. After the fireworks display, Mr. King found his wife and sat with her for awhile. Mr. King testified that they were seated approximately 30 feet from the stage. At one point, his wife pointed at defendant, who appeared to be intoxicated. Mr. King specifically testified:

"Q. Is there anything that your wife did, without getting into a conversation?

A. Yes. She pointed at someone.

Q. And where did she point?

A. It would be about—we're looking at the stage, it would be on our left-hand side at not a 90-degree angle, but like a 70-degree angle, about 15 feet away."

Q. And did you look over there?

A. Yes, I did.

Q. What did you see?

A. I saw a gentleman who appeared to be intoxicated."

Mr. King observed that defendant was walking around the area, and L.R. was just sitting there. He testified:

"I was going to get a police [officer] and [sic] to ask him to come over to check on the guy, make sure he was okay. When I got up, I sort of turned around, I noticed Officer Tichenor and Officer Heller were standing about 10 feet back behind the gentleman, observing him."

Mr. King figured that the officers would handle the situation, so he sat back down and continued watching defendant with L.R. Defendant crawled on top of L.R., who was lying flat on the ground, and kissed her on the lips. Mr. King specifically testified:

"Q. When you say he was on top of her, was he over her, was he actually touching her? What was—

A. He was pressing down on her.

Q. And where was—now, you said that you saw him kissing her?

A. Correct.

Q. Where was he kissing her?

A. On her mouth.

\* \* \*

Q. Was his—when his mouth was on the little girl's mouth, did you see his mouth doing anything?

A. I saw his mouth open.

Q. And his mouth was open when it was on the little girl's lips?

A. Correct.

Q. And did you see his mouth moving or doing anything?

A. No.

Q. Now, you said that the little girl was laying [sic] on her back and he was on top of her. Where was his like—his body in relationship to her body?

[Objection overruled.]

A. He was—best way I can describe it, he was astraddle, on top of her like.

Q. Okay. So where were his legs in relationship to her?

A. The one leg of the little girl was on the outside of his legs. His legs were like together. The other leg I couldn't see from my vantage point."

The police then rushed over and pulled defendant up. Defendant was "putting up a fight" when the officers tried to handcuff him.

Mr. King was then asked how long the kiss was that he observed. Mr. King answered:

"It really couldn't have been all that long, because the officers were there quicker than you—very quick. They reacted very quickly."

On cross-examination, when asked to explain his vantage point when observing the kiss, Mr. King testified:

"If I'm sitting here in my chair, they're over here (indicating), and their feet, for lack of a better word, were towards the stage and their heads to the opposite direction to the stage, so neither their head nor feet would be closer to me. They're basically parallel with me."

Richard Heller, a Sugar Grove police officer, testified that on the night of July 29, 2006, he was working as a patrol officer with another officer, Fred Tichenor, at the Corn Boil Festival. A woman approached Officer Heller and Officer Tichenor and gave them some information about an individual near the stage. The officers proceeded to the area and began observing defendant with L.R. while standing about 15 to 20 feet away from them. Defendant was lying on his back, with his right hand covering his eye. L.R. was sitting on his stomach and sticking her finger in defendant's belly button. Defendant then put his arms around her and swung her over so that she was lying on her back, and he straddled her with his waist area coming up to L.R.'s thigh area or knees. Defendant then started to kiss L.R. on her lips. He kissed her about three times, and each kiss lasted about 5 seconds. Neither of them were moving their faces during the kisses. Officer Heller testified:

"Q. When the Defendant had his mouth on the young girl's mouth, was he just—the mouth just pressed up flat against each other, or were either of them moving their faces?

[Objection overruled.]

Q. You can answer.

A. No. It was more, you know, as he would kiss her he would move around.

Q. You say he would move around?

A. His head and his mouth would move around.

Q. All right. Do you remember seeing him doing anything with his hands or his arms during this time?

A. No. He—no.

Q. And what was the relationship between his body and her body? I know you said that he was on top of her at this point in time.

A. He was like straddling her. He had his legs straddling her.

Q. Okay.

A. Like one knee on one side of her body and the other knee on the other.

Q. And his waist area would have been approximately where in relation to her waist area?

A. Probably in her, like maybe thigh or where her knees are."

L.R.'s legs were straight when she was lying on the ground and defendant was giving her the kisses. At that point, Officer Heller and Officer Tichenor removed defendant from L.R. by grabbing defendant's arms and lifting him up. L.R. ran toward some people and started crying. Defendant was pulling away from the officers and "flinch[ing]" away from them. Officer Heller tried to verbally command defendant to stop resisting but he "didn't really say nothing," and he "just wasn't listening." The time that it took to get defendant off of L.R. and in compliance was probably three to four minutes.

Officer Tichenor testified that a woman with some information approached him and Officer Heller after the fireworks display at the Corn Boil Festival. The officers proceeded to the area that the woman described. Officer Tichenor observed defendant rolling on the ground with L.R. At times, defendant was holding L.R., by her waist, up in the air over his chest. Defendant kissed her on the cheek and then on her lips while he was lying on the ground and holding L.R. up in the air. The kiss on her mouth lasted about 15 seconds. Officer Tichenor specifically testified:

"Q. And did you observe anything else while you were watching the man and the child roll around?

A. We observed him roll around the ground with the child, okay. After he rolled, he picked her up, he shook her, he kissed her on the cheek. After he kissed her on the cheek, he then kissed her on the mouth.

Q. And where was—where was the child when he kissed—you described that he shook her?

A. Correct.

Q. Where was she when he shook her?

A. He was holding her up in the air.

Q. All right. And then you said he kissed her on the cheek. Where was he in relationship to the child when he kissed her on the cheek?

A. His back was on the ground. He was on the ground and he was holding her up.

Q. And then you said he kissed her on the mouth, and where was he in relationship to the child went [*sic*] he kissed her on the mouth?

[Objection overruled.]

Q. Okay. And where was he then when he kissed her on the mouth?

A. He was on the ground when he was kissing her on the mouth." Officer Tichenor stated that the kiss on the mouth lasted "approximately 15 seconds." He then testified:

"Q. And did you observe what type of—did you observe anything about his mouth when he was kissing her on the mouth?

A. It was just lip-to-lip, was what I observed."

Defendant then rolled around on the ground, and L.R. was on the ground rolling away from him. Defendant then rolled on top of L.R. and kissed her on the lips again. The kiss lasted about 10 seconds. Officer Tichenor testified:

"Q. And, okay, and I'm sorry, where was she when he kissed her on the lips?

A. Okay. She was on the ground, her back was on the ground.

Q. All right. And where was he in relationship to her?

A. He was on top of her.

Q. And when you say he was on top of her, was he over her, directly touching her? What do you mean on top?

A. He was over her with his body on top of her. As she was on the ground, he was on top of her.

Q. Were their bodies touching?

A. Yes, they were.

Q. And that kiss that you observed when he was lying directly on top of her, how long did that kiss last?

A. Approximately 10 seconds. We—at that point we went and pulled him off of her."

Officer Tichenor, along with Officer Heller, then proceeded to pull defendant up from the ground, and "threw him over to the side." Officer Tichenor told defendant that he was under arrest, defendant "came back towards the girl," and Officer Tichenor had to "wrestle" with him for approximately 10 seconds to get handcuffs on defendant. Officer Tichenor admitted that when he initially approached defendant, he approached from behind. He also acknowledged that defendant appeared intoxicated.

On cross-examination, Officer Tichenor admitted that he had testified that defendant touched L.R.'s leg and stomach when she was rolling away from him while they were rolling around on the ground. He

admitted that other than that one time, he did not observe defendant touch L.R.'s stomach; he never observed defendant touch L.R.'s leg; he observed defendant touch L.R.'s waist when he was holding her up in the air; and L.R. did not pull away from defendant when he kissed her.

Kathy Byrne, a child-protection investigator for the Department of Children and Family Services, testified that on July 30, 2006, she visited defendant at the Kane County jail. Defendant denied that he molested L.R. He explained that he was living with his daughter to help her with L.R. and the house while she was on bed rest with a high risk pregnancy. He received permission to take L.R. to the Corn Boil, and he admitted he agreed not to drink any alcohol at the festival. He admitted that he drank a few shots of vodka and brought beer to the fairgrounds. He denied that he was lying on top of L.R. at any time. He said he could not recall much after the police came, because he was intoxicated.

After the parties rested, the trial court granted defendant's motion for a directed finding on counts II, III, VI, and VII, all alleging aggravated criminal sexual abuse. The trial court later ruled on the remaining counts. The trial court found defendant not guilty of the aggravated-criminal-sexual-abuse allegations in counts I and V, which were based on defendant knowingly pressing his body against the body of L.R. for the purpose of sexual gratification or arousal. Counts IV and VIII were based upon defendant kissing L.R. for the purpose of sexual arousal or gratification. The trial court found that there was evidence that defendant kissed L.R., and the kisses ranged from 4 to 15 seconds in time.[1] The trial court found that this range exceeded a reasonable peck on the lips. Evidence that defendant had his mouth open while kissing L.R. indicated that defendant's action was intended for something other than a reasonable kiss from a grandfather. Further, the manner in which defendant positioned his body while kissing L.R. indicated that his conduct was sexual. By positioning, the court meant the straddling of L.R. while kissing her as well as kissing her while his legs were between hers. The court found defendant guilty of counts IV and VIII but merged those counts. Finally, as to count IX, resisting a peace officer, the court found defendant guilty. The court determined that defendant pulled away as the officers were attempting to arrest him and based on that, he was guilty of resisting arrest.

---

[1] It is interesting to note that the trial court determined the evidence established a *range* of 4 to 15 seconds. The dissent, however, spends much time arguing how long 15 seconds is and no time on how short 4 seconds is. One. Two. Three. Four. The range is now fully represented in this opinion.

Defendant moved for judgment notwithstanding the verdict or for a new trial. On May 11, 2007, the trial court denied the motion. On October 26, 2007, the matter proceeded to sentencing. The trial court sentenced defendant to 36 months' probation for the aggravated-criminal-sexual-abuse conviction and 84 days in the Kane County jail, with 42 days' credit for time served, for the resisting-a-peace-officer conviction. Defendant timely appealed, arguing that the State failed to prove him guilty beyond a reasonable doubt.

■■ We first address defendant's aggravated-criminal-sexual-abuse conviction. An accused commits criminal sexual abuse if he or she commits an act of sexual conduct by the use of force or threat of force. 720 ILCS 5/12—15 (West 2006). To be considered aggravated criminal sexual abuse under section 12—16(b) of the Criminal Code of 1961 (Code) (720 ILCS 5/12—16(b) (West 2006)), the sexual conduct must have been with a victim who was under 18 years of age at the time of the incident, and the accused must have been a family member. Section 12—12(e) of the Code defines "sexual conduct" as:

"any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/12—12(e) (West 2006).

In this case, it was undisputed that L.R. was under 13 years of age and that defendant was a family member. It was also undisputed that defendant kissed L.R. on her lips. The question on appeal is whether the State met its burden of proving that defendant kissed L.R. for the purpose of sexual gratification or arousal. When presented with a sufficiency-of-the-evidence challenge, it is not the function of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261. We will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Collins*, 106 Ill. 2d at 261. The critical inquiry on review of the sufficiency of the evidence is to determine whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007), quoting *Jackson v. Virginia*, 443 U.S. 307, 318, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781,

2788-89 (1985). This standard of review applies whether the evidence is direct or circumstantial and whether the defendant receives a bench trial or jury trial. *Wheeler*, 226 Ill. 2d at 114. The trier of fact is best equipped to judge the credibility of witnesses, and the fact finder's determinations are entitled to great deference. *Wheeler*, 226 Ill. 2d at 114-15. However, a fact finder's decision is "neither conclusive nor binding," and a conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Wheeler*, 226 Ill. 2d at 115. Appellate review of the sufficiency of the evidence must include consideration of *all* of the evidence, not just the evidence convenient to the State's theory of the case. *Wheeler*, 226 Ill. 2d at 117. Although we are not required to search out all possible explanations consistent with innocence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances, we must ask, after considering all of the evidence in the light most favorable to the State, whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. *Wheeler*, 226 Ill. 2d at 117-18. With these principles in mind, we review defendant's convictions.

Intent to arouse or satisfy sexual desires may be established by circumstantial evidence, which the trier of fact may consider by inferring defendant's intent from his conduct. *People v. Kolton*, 347 Ill. App. 3d 142, 148 (2004). Defendant urges this court to use a test devised by the Iowa Supreme Court in determining whether an act was sexual. In *State v. Pearson*, 514 N.W.2d 452, 454 (Iowa 1994), the defendant argued that, because he and his victim remained clothed throughout a sexual abuse incident, there was no "sexual contact." The court stated that the sexual nature of the contact could be determined from the type of contact and the circumstances surrounding it, including: (1) whether the contact was made to arouse or satisfy the sexual desires of the defendant or the victim; (2) the relationship between the defendant and the victim; (3) whether anyone else was present; (4) the length of the contact; (5) the purposefulness of the contact; (6) whether there was a legitimate, nonsexual purpose for the contact; (7) when and where the contact took place; and (8) the conduct of the defendant and the victim before and after the contact. *Pearson*, 514 N.W.2d at 455; see also *State v. Davis*, 584 N.W.2d 913, 917 (Iowa App. 1998) (using similar factors to determine whether conduct surrounding a sexual abuse incident was sexual). We need not "adopt" the Iowa Supreme Court's "test," as Illinois law already incorporates the factors listed by the Iowa Supreme Court. The Iowa Supreme Court list is merely a list of circumstantial factors, which Illinois courts, despite never having formally listed the factors, already

consider when determining whether a defendant's conduct was intended for sexual gratification or arousal.

In *People v. Calusinski*, 314 Ill. App. 3d 955, 956-57 (2000), the defendant was convicted of criminal sexual abuse for having placed his tongue in the victim's mouth, with force, for the purpose of sexual arousal. The victim, age six, testified that she went outside after dark to look for a stuffed animal that she lost in the yard. *Calusinski*, 314 Ill. App. 3d at 956. She testified that she saw the defendant in the yard, that he placed his arms on her, that he kissed her on the lips, and that his tongue touched her during the kiss. *Calusinski*, 314 Ill. App. 3d at 956-57. The victim's mother testified that after the incident, the victim came inside the home with a shocked look on her face and told her mother what had happened. *Calusinski*, 314 Ill. App. 3d at 958. The defendant lived next door to the victim. *Calusinski*, 314 Ill. App. 3d at 958. The defendant denied that he kissed the victim on the lips, and he stated he kissed her cheek and it was possible his tongue hit her cheek. His mother testified that she saw the defendant kiss the victim's cheek. *Calusinski*, 314 Ill. App. 3d at 958. The trial court found the defendant guilty, finding the victim's testimony compelling, credible, and consistent with her statements to her mother immediately following the incident. *Calusinski*, 314 Ill. App. 3d at 959.

On appeal, the defendant argued that the State failed to prove that he kissed the victim for the purpose of sexual arousal. This court stated that kissing can constitute sexual conduct, and kissing often serves as a preliminary stimulant for arousing or appealing to sexual passions and desires. *Calusinski*, 314 Ill. App. 3d at 961. Having found that the defendant placed his tongue in the mouth of a six-year-old girl, we could not ascribe an innocent motive to such conduct, as "French kisses" are inherently sexual. *Calusinski*, 314 Ill. App. 3d at 961-62. Therefore, we affirmed the defendant's conviction. *Calusinski*, 314 Ill. App. 3d at 962.

■ We find the facts of this case distinguishable from *Calusinski* because the kisses involved here were not "French kisses" and no other acts accompanied the kissing to suggest that defendant was acting to gratify sexual urges or to arouse himself. Further, in *Calusinski*, the child was startled by the act, the act was performed in the dark with no other persons around, and the act was performed by a neighbor and not a close family member. We note here that the kisses were given in a public place with many people around; that no evidence was presented that L.R. was upset by the kisses; there was evidence that she did not pull away from the kisses; and lip kisses were typical for L.R. and defendant. The witnesses' versions all have inconsistencies in certain details. Mrs. King testified to two four- to five-second

closed-mouth kisses with little movement, given while they were lying next to each other. Mr. King testified to one kiss that was "not very long at all," where defendant's mouth was open but not moving on L.R.'s lips and while he was pressing down over her with his legs together and one of L.R.'s legs to defendant's side. Officer Heller testified to three five-second kisses with defendant's head and mouth moving around while L.R. was flat on the ground and defendant's knees were to her sides; his waist coming to approximately her knees or thighs.[2] Officer Tichenor testified to two kisses, 10 seconds and 15 seconds, that were lip-to-lip with no movement while defendant was "on top" of L.R. The one detail all witnesses agreed upon was that defendant was so intoxicated that he could not stand and was falling down.

According to the trial court's findings, the kisses were as short as 4 seconds to as long as 15 seconds in duration with no use of defendant's tongue. Defendant and L.R. were rolling around on the ground, in a crowded public place. L.R. was sticking her finger in defendant's belly button and sitting on defendant's stomach. Defendant picked L.R. up and held her in the air. Although Officer Heller stated that defendant "straddled" L.R., his waist area was never said to be touching L.R.'s waist area but was rather near her knees or thighs. His legs were to her sides. Officer Tichenor testified that defendant was on top of L.R. and their bodies were "touching." He did not state what body parts were touching. Mrs. King did not state that they were touching when he kissed her, as she testified that they were lying on the ground next to each other. Mr. King described defendant as having his legs together and one of L.R.'s legs to the side. Earlier, he testified that defendant was pressing down on her. He did not state what parts were pressing down. He saw that defendant's mouth was open but it was not moving while on L.R.'s lips. Although L.R. could not testify, there was no evidence that L.R. was upset by defendant's conduct during or after the event, except when she cried when the police handcuffed defendant. In fact, Officer Tichenor admitted that L.R. was not pulling away from her grandfather when he kissed her. L.R.'s mother further testified that L.R. would give relatives kisses on the lips and had a good relationship with defendant. She testified that she saw L.R. after the incident and that L.R. was doing well.

---

[2]The trial court questioned Officer Heller's testimony, stating that he was the only witness to describe a one-minute kiss. This was inaccurate, as Officer Heller testified to three five-second kisses and not to a one-minute kiss, consistent with the Kings' estimations.

Based on this circumstantial evidence, we cannot find that a rational trier of fact could conclude that such kisses between a grandfather and granddaughter at a public festival while playing on the ground were given for the purpose of sexual gratification or sexual arousal. The kissing that was described (as inconsistent as the testimony was), with each version viewed in the light most favorable to the State, does not indicate that the kissing was performed for the purpose of sexual gratification or arousal. There was clearly no tongue kissing and no bodily touching that would lead a rational trier of fact to conclude beyond a reasonable doubt that the kissing was performed for a sexual purpose. The body positioning or touching described does not rationally lead to an inference of sexual arousal or gratification, especially given the overall evidence that defendant was not using force, L.R. was rolling around on the ground with defendant and sticking her finger in defendant's belly button, L.R. was being held up in the air by her grandfather and kissed on the cheek, L.R. had a history of giving family members lip kisses, there was no use of tongues, and there was no rubbing, grinding, or other unusual bodily touching. Further, the conduct was performed in a public place in close proximity to numerous witnesses, and all witnesses testified that defendant was visibly intoxicated, as indicated by his extreme lack of motor skills (inability to stand or walk).[3] *Cf. People v. Kirilenko*, 1 Ill. 2d 90, 95 (1953) (court considered multiple factors in affirming conviction of indecent liberties with a child: defendant was stranger to child, treated her to ice cream, candy, and sodas, took her to his private bedroom, kissed her on the bed, asked to kiss her breasts, took off his shirt, and performed exercises in front of her); *People v. Dugan*, 237 Ill. App. 3d 688, 700 (1992) (in aggravated-criminal-sexual-abuse case, evidence was sufficient to sustain finding that victims were touched for the purpose of sexual gratification where victims testified that the defendant touched them in a "circular motion" and where the defendant had gyrated his hips with his penis between the legs of victims while alone with victims); *People v. C.H.*, 237 Ill. App. 3d 462, 473-74 (1992) (in aggravated-criminal-sexual-abuse case, evidence was sufficient to establish touching was done for the purpose of sexual

---

[3]The dissent points out that we have failed to explain the relevance of these facts (including defendant's intoxication, the public location of the events, etc.) but itself fails to explain its rationale in ignoring these facts entirely. These circumstantial facts are obviously relevant to our consideration of defendant's intent to arouse or satisfy sexual desires. As stated, the *Collins* standard requires us to consider all of the record facts and not only those facts that are convenient to the State.

gratification or arousal where the defendant touched the victim's pubic area on several occasions in the victim's bedroom, the victim was upset by the touching, and the victim was startled by her mother walking in during the touching); *People v. Cole*, 193 Ill. App. 3d 990, 992 (1990) (in aggravated-criminal-sexual-abuse case, evidence was sufficient to establish touching was done for the purpose of sexual gratification where the defendant's kissing of victim's lips and chest was accompanied by fondling, removal of clothes, and victim resistance, and was performed outside the presence of others); *State v. Stout*, 34 Kan. App. 2d 83, 88-89, 114 P.3d 989, 993-94 (2005) (affirmed jury finding that lengthy "French kiss" that lasted for a couple of minutes in the defendant's bed followed by profession of true love was performed for purpose of sexual arousal though court declined to hold that tongue kiss constituted lewd conduct as a matter of law); *People v. Sumpter*, 190 Misc. 2d 115, 117, 737 N.Y.S.2d 219, 221 (2001) (rational trier of fact could conclude the defendant's actions of forcibly attempting to "French kiss" coworker and grabbing her buttocks against her will were performed for the purpose of sexual gratification under sexual abuse statute); *Commonwealth v. Capo*, 727 A.2d 1126, 1127-28 (Pa. Super. 1999) (finding the defendant's conduct was performed for the purpose of sexual gratification in indecent assault case where he forcibly grabbed arms of victim who was a stranger to him, attempted to kiss her, and rubbed her shoulders and stomach before victim fled); *People v. Martinez*, 5 Cal. 4th 434, 453, 903 P.2d 1037, 1048, 45 Cal. Rptr. 2d 905, 916 (1995) (in lewd conduct case, sexual gratification could be reasonably inferred where the defendant was a stranger to victims, forcibly grabbed them near junior high school, kissed or attempted to kiss victims against their will in an "ostentatious and passionate way," and was aroused during the contact).[4] While defendant's public display of intoxication while supervising his young granddaughter was inappropriate, his conduct was not proven beyond a reasonable doubt to constitute aggravated criminal sexual abuse. Considering all of the record evidence, we cannot find that a rational trier of fact could infer, beyond a reasonable doubt, that defendant's kissing was performed for the purpose of sexual

---

[4]We cite these cases to illuminate the stark contrast in the evidence present in the case at bar and the evidence that supported these convictions. The dissent finds these cases irrelevant and reasons that we cite to no case that involved a reversal. However, the dissent itself cites to no case with comparable facts to the case here that sustained a conviction of aggravated criminal sexual abuse. Thus, the absence of a reversal is no more persuasive than the absence of a comparable factual scenario that led a court to affirm.

gratification or arousal. Therefore, we reverse defendant's aggravated-criminal-sexual-abuse conviction.

We disagree with the dissent's conclusion that there was ample evidence, when considered in its entirety, to support an inference that defendant's conduct was performed for the purpose of sexual gratification or arousal. We do not dispute the facts that defendant kissed L.R. at least once, that the range of testimony estimated the kiss(es) to be from 4 to 15 seconds, and that there was testimony that they were touching at times. We do, however, dispute that the State's evidence could lead a rational trier of fact to conclude that the kissing was performed for the purpose of sexual gratification or arousal, a required element to sustain a conviction under section 12—16 of the Code. The length of time of the kisses alone, without more, does not support the element of a sexual purpose, and the additional scant descriptions of bodily touching do not overcome the reasonable doubt standard. The trial court itself, in finding defendant not guilty of counts I and V, found that when defendant was said to be "straddling L.R.," there was "no evidence that their bodies were pressing together at the time." Further, it found that the State had not proven beyond a reasonable doubt that the "pressing of Defendant's body against the body of L.R. was for the purpose of sexually initiating or gratifying himself." In analyzing the charged conduct in counts IV and VIII, the kissing of L.R., we similarly find that the touching was not performed for a sexual purpose. We further disagree with the dissent that other facts presented (that the event took place in public, that many witnesses were present, that defendant was by all accounts visibly intoxicated, that L.R. was known to kiss relatives on the lips, that L.R. was not resisting the kisses and was not said to be upset by the events) are irrelevant or should not be considered, as we have a duty to consider all record evidence. As stated earlier, taking the evidence in the light most favorable to the State, no rational trier of fact could conclude that defendant was kissing L.R. for a sexual purpose where defendant acted in a public place, in the view of many witnesses, with his granddaughter who always kissed relatives on the lips, and where there was no evidence of any tongue-kissing, fondling, groping, or rubbing on L.R.'s body.

■ Next, we address defendant's conviction of resisting a peace officer (720 ILCS 5/31—1(a) (West 2006)). Section 31—1(a) of the Code provides that "a person who knowingly resists or obstructs the performance by one known to the person to be a peace officer or correctional institution employee of any authorized act within his official capacity commits a Class A misdemeanor." 720 ILCS 5/31—1(a) (West 2006). Defendant argues that he did not knowingly impede the officers

from arresting him. We disagree. As stated earlier, the relevant question when presented with an insufficiency-of-the-evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Section 31—1(a) prohibits a person from committing a physical act of resistance or obstruction that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties. *People v. McCoy*, 378 Ill. App. 3d 954, 962 (2008). Passive acts that impede an officer's ability to perform his duties, such as repeatedly refusing an officer's order to exit a vehicle, may also violate section 31—1(a). See *People v. Synnott*, 349 Ill. App. 3d 223, 227-28 (2004) (affirmed resisting-arrest conviction where driver repeatedly refused the officer's order to exit his vehicle where driver was suspected of driving under the influence). Whether the defendant's conduct is active or passive, if the conduct impeded the officer's attempt to execute an arrest, and the conduct was performed knowingly, the acts of resistance will support a conviction of resisting a peace officer, even if the underlying attempted arrest was unwarranted. *McCoy*, 378 Ill. App. 3d at 962, 964.

■ There is sufficient evidence in this case to uphold the resisting-a-peace-officer conviction. Officer Heller testified that he and Officer Tichenor grabbed defendant's arms and lifted him up from the ground. Although Officer Tichenor admitted that they did this by approaching defendant from behind without warning, Officer Tichenor stated that as he told defendant that he was under arrest, defendant "came back towards [L.R]." Officer Heller further stated that defendant was pulling away from them and "flinch[ing]," and that Officer Heller tried to verbally command defendant to stop resisting but he was not listening. The officers "wrestled" with defendant for 10 seconds to get him handcuffed. According to Officer Heller, the entire sequence from when they first grabbed defendant until the time they had him handcuffed took three to four minutes. The Kings' testimony confirmed that the officers went up to defendant, grabbed him, and pulled him off of the ground. Mr. King testified that defendant put up a fight when the officers tried to handcuff him.

These facts, taken in the light most favorable to the State, indicate that defendant hindered the officers from executing the arrest. For three to four minutes, the officers tried to instruct defendant that he was under arrest, and they had to struggle to get him in handcuffs. Having been approached from behind, it likely took defendant, who was by all accounts intoxicated, a minute or two to comprehend what was happening. However, after being told that he was under arrest,

defendant still walked away from the officers and toward L.R. and "wrestled" with the officers or "put up a fight" to avoid being handcuffed. The evidence sufficiently established that defendant failed to abide by the officers' instructions and impeded their attempts to arrest him, even if only for a short period of time. See *Synnott*, 349 Ill. App. 3d at 229 (conviction upheld where the uniformed officer stopped vehicle, advised the defendant that he needed him to exit the vehicle, and defendant repeatedly refused the officer's order); *People v. Greenwood*, 39 Ill. App. 3d 898, 901 (1976) (conviction upheld where the defendant was approached by uniformed officers, advised that she was being arrested, and asked to cooperate and the defendant refused to comply and engaged in a physical altercation with officers). Therefore, defendant's insufficiency-of-the-evidence claim fails and we affirm his resisting-a-peace-officer conviction.

In conclusion, we reverse defendant's conviction of aggravated criminal sexual abuse and affirm his conviction of resisting a peace officer.

Affirmed in part and reversed in part.

HUTCHINSON, J., concurs.

JUSTICE O'MALLEY, concurring in part and dissenting in part:

The majority acknowledges that, under *Collins*, we cannot reverse a guilty finding for insufficient evidence unless, viewing the evidence in the light most favorable to the prosecution, we conclude that no rational trier of fact could have found defendant guilty. 394 Ill. App. 3d at 91, citing *Collins*, 106 Ill. 2d at 261. In its statement of facts (394 Ill. App. 3d at 90), the majority makes perfunctory mention of some of the trial court's findings, which, of course, are critical under *Collins*. It also uses quotes from the trial court opinions on other counts (on which the trial court found defendant not guilty) to support the decision to reverse the trial court's finding on the aggravated-criminal-sexual-abuse count now at issue. 394 Ill. App. 3d at 96. However, the majority does not quote, and its analysis does not address, the trial court's findings with respect to the aggravated-criminal-sexual-abuse conviction the majority today overturns. I cannot take the same approach. I instead follow the evidence, the trial court's findings, and the law governing review of both, to the inexorable conclusion that we should affirm defendant's convictions.

The well-established *Collins* standard demands not only that we consult, but that we actually defer, to a trial court's findings regarding the sufficiency of the evidence to convict. The standard can be difficult

to apply, especially in jury cases, because triers of fact often do not record their reasoning, thus leaving reviewing courts to speculate as to the possible grounds for their decisions. Here, however, review under the *Collins* standard should be relatively easy, because the trial court made the effort to render a lucid and logical explanation of its view of the evidence. Therefore, although the majority analysis fails to quote any of the trial court's findings that it overturns, I quote in full the trial court's reasoning on the aggravated-criminal-sexual-abuse charge now at issue. After hearing four separate witnesses to the incident describe defendant's conduct, the trial court ruled as follows on the charges related to defendant's kissing L.R.:

> "The kisses by the Defendant were more than pecks on the lips, which might have been acceptable considering the testimony of L.R.'s mother. Even discarding the testimony of the one-minute kiss by Heller, according to the other witnesses, kisses on L.R.'s mouth ranged from 4 to 15 seconds, which exceeded a reasonable peck on the lips.
>
> Evidence that Defendant had his mouth open while kissing L.R. on the lips is a further indicator that Defendant's action was intended for something other than a reasonable kiss on the lips by a grandfather.
>
> The manner in which the Defendant positioned his body while kissing L.R. is an indicator that his conduct was sexual in nature. By positioning, I mean the straddling of L.R. while kissing her, as well as kissing her while his legs were between hers.
>
> The fact that there was more than one kiss on the lips in a brief period of time may suggest his conduct was unreasonable, although by itself does not carry a great deal of weight."

These are not the words of an irrational trier of fact, and, under the *Collins* standard, the majority could not acknowledge them and still reach its desired result. So, instead, the majority's analysis ignores the trial court's findings and substitutes its own. The majority's findings, not surprisingly, contrast sharply with the trial court findings the majority declines to address.

When it found defendant guilty for the above-quoted reasons, the trial court relied on four discrete factors drawn from the evidence: the duration of the kisses, the "open-mouth" nature of the kisses, the body positioning during the kisses, and the number of kisses.

On the first factor, the majority concludes, after a recapitulation of some of the testimony, that "[t]he length of time of the kisses alone *** does not support the element of a sexual purpose." 394 Ill. App. 3d at 97. I cannot say for certain how the majority reaches this conclusion, but I can say that I disagree that the duration of the kisses does not support a finding of guilt. Fifteen seconds—the time established

by the evidence when construed in a light most favorable to the State—is a very long time in this context. Defendant started kissing the four-year-old girl. One. Two. Three. Four. Five. Six. Seven. We are not yet halfway done. Eight. Nine. Ten. Eleven. Twelve. Thirteen. Fourteen. Fifteen. Defendant stopped kissing the four-year-old girl. Even the quick reader will agree that the duration of that kiss tends to indicate something more than an innocent peck. (I illustrate just one kiss, but, as I discuss below, the trial court found that defendant did not kiss the girl just once.) The majority turns the trial court's finding on this first factor completely on its head by concluding that the duration of the kisses did not support a finding of guilt. I disagree with the majority's conclusion that no rational person could share the trial court's interpretation of this factor. See *Collins*, 106 Ill. 2d at 261.

The majority responds to the above illustration by sardonically counting to four—the lower end of the 4- to 15-second duration described in the testimony—and then implying that my dissent is only partially representing the facts by illustrating only the 15-second duration. 394 Ill. App. 3d at 90 n.1. There is a good reason I spend "no time [arguing] how short 4 seconds is" (394 Ill. App. 3d at 90 n.1). As *Collins* itself explained, " '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.' " (Emphasis omitted.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789. Here, in the light most favorable to the State, the evidence establishes at least one 15-second kiss. The fact that defendant also kissed this child an unspecified number of additional times for several seconds but less than 15 seconds hardly undercuts the significance of the trial court's assessment of the 15-second kiss. The majority's criticism of my emphasis on the 15-second count further illustrates its failure to follow *Collins*.

On the trial court's second factor, the majority analysis not only ignores the trial court's finding that the kisses were open-mouth, but actually implies the opposite by repeating several times that the kisses did not involve tongues[5] while failing to mention at the same time that the trial court found that defendant had an open mouth during

_____

[5]The majority is correct when it says that there was no testimony that defendant used his tongue. During his testimony, Mr. King stated that "to [him] it looked like [defendant] was giving her tongue kisses," but, for reasons that are not clear from the record, the trial court sustained defense counsel's

the kisses. (The majority mentions evidence that the kisses were open-mouth, but it does not do so when it assigns persuasive force to the idea that defendant did not use his tongue.) I disagree with the majority's (unstated) conclusion that no rational person could share the trial court's interpretation that the open-mouth nature of the kisses supported a finding of guilt. See *Collins*, 106 Ill. 2d at 261.

On the third factor, again, the majority takes the evidence of defendant's body positioning and draws an inference directly contradicting the inference drawn by the trial court. The majority accomplishes this by twisting the trial court's finding. While the trial court relied on "body positioning" during the kisses, the majority changes the issue to whether defendant's "body positioning *or touching*" (emphasis added) (394 Ill. App. 3d at 95) during the kisses indicated a sexual motive. The majority then quotes passages in which the trial court itself stated that the evidence did not support a conviction of sexual abuse based on bodily touching. 394 Ill. App. 3d at 95-96. (These quotes come from the trial court's rulings on counts unrelated to the count now at issue, which centers on defendant's kissing the victim.) By changing the trial court's findings so that they rely on "touching," the majority causes the trial court's findings to appear contradictory. In actuality, the trial court declined to convict defendant based on instances of bodily contact, but it thought defendant's positioning during the kisses, even if the touching alone was not sexual abuse beyond a reasonable doubt, nevertheless supported conviction based on the kisses. I think the testimony describing defendant's straddling L.R. or having his legs between hers was sufficient to allow the trial court rationally to conclude that defendant's body positioning during the kisses supported a finding of guilt. I disagree with the majority's conclusion that no rational person could share the trial court's interpretation of this factor. See *Collins*, 106 Ill. 2d at 261.

Finally, the majority analysis does not address the trial court's fourth factor, the number of the kisses, other than to acknowledge that "defendant kissed L.R. at least once." 394 Ill. App. 3d at 97. I disagree with the majority's (unstated) conclusion that the trial court was irrational when it found that the number of the kisses helped establish that defendant acted for sexual gratification or arousal.

---

objection to the testimony. The trial court then refrained from relying in any way on that rejected testimony when it rendered its ruling. Its conclusions regarding the nature of the kisses between defendant and the girl were limited to those based on testimony that defendant's mouth was open, thus further demonstrating how careful the trial court was in dealing with the evidence.

Taken in total, the trial court's findings indicate that, as part of a series of closely successive contacts, defendant kissed his four-year-old granddaughter on the lips, with an open or moving mouth, multiple times, for up to 15 seconds at a time, while the young girl was supine and he straddled her or put his legs between hers. There was ample evidence to support these findings, which, especially when combined, are more than sufficient under *Collins* to support the inference of sexual purpose necessary to affirm defendant's conviction. I therefore disagree with the majority's position that no rational trier of fact could have found defendant guilty based on the above evidence. See *Collins*, 106 Ill. 2d at 261.

The majority avoids direct confrontation with the trial court's findings through several techniques, including separating the factors instead of considering them cumulatively as the trial court did (and even then outright failing to consider parts of the trial court's ruling), obfuscating its discussion of the length of the kisses by blending it with the discussion of defendant's body positioning, using conclusory language or repetition of facts in the place of analysis, and infusing its analysis with facts whose relevance is never explained.[6] In response to this point, the majority objects that I "fail[ ] to explain [my] rationale [for] ignoring these facts entirely." 394 Ill. App. 3d at 95 n.3. Quite to the contrary, I have explained my rationale—the relevance of those facts has not been explained. Indeed, even after I point out that the majority does not explain why these facts are relevant, all the majority offers to explain their relevance is the conclusory, and unsupported, statement that the facts are "obviously relevant." 394 Ill. App. 3d at 95 n.3. The majority's response proves my point that it does not explain the relevance of many of the facts on which it relies, as well as my point that it relies on conclusory language in the place of analysis.

---

[6]For example, to distinguish this case or to argue that defendant's actions were not for sexual gratification or arousal, the majority uses the ideas that the girl here was not "startled by the act" (394 Ill. App. 3d at 93), the act was not "performed in the dark" (394 Ill. App. 3d at 93), the act was performed by a "close family member" rather than a neighbor (394 Ill. App. 3d at 93), there was no evidence "that L.R. was upset by" defendant's conduct (394 Ill. App. 3d at 93, 94) there was evidence that she did not pull away from the kisses (394 Ill. App. 3d at 93, 94), "defendant was so intoxicated that he could not stand and was falling down" (394 Ill. App. 3d at 94), "defendant was not using force" (394 Ill. App. 3d at 95), "L.R. was rolling around on the ground with defendant and sticking her finger in defendant's belly button" (394 Ill. App. 3d at 95), and "L.R. was being held up in the air by [defendant] and kissed on the cheek" (394 Ill. App. 3d at 95).

The majority also cites as authority a string of cases in which courts affirmed sexual-purpose-based convictions based on facts much more lurid than those present here. 394 Ill. App. 3d at 95-96. But the issue is not whether the conduct here was as prurient as that of another case or whether the majority can set a "stark contrast" (394 Ill. App. 3d at 96 n.4) between this case and others, but whether a rational trier of fact could infer sexual purpose based on these facts. Further, the litany of cases in the majority opinion all involve courts affirming convictions rather than overturning them. Therefore, they do not help the majority explain what quantum of evidence allows a reviewing court to reverse a trial court's finding of guilt. By citing these cases without observing the difference between a reviewing court that affirms and one that reverses a trial court finding of guilt, the majority illustrates that it has not fully contemplated the implications of the deference we must afford the trial court's findings under *Collins*. If the majority could point to some cases in which reviewing courts overturned convictions based on stronger evidence, it might find support for its holding, but it gains nothing from citation to stronger cases in which the reviewing courts affirmed the trial courts, other than a demonstration of the most straightforward applications of the rule I champion here, that reviewing courts should defer to trial court findings. From the majority's inability to locate a case in which a reviewing court overturned a trial court on facts weaker, or equivalent to, those here, the clear implication is that no such cases exist. Defendant has not cited any, and the majority's extraordinary efforts—its citations reveal a coast-to-coast survey of American jurisprudence—do not seem to have uncovered one.[7]

*Collins* has long been understood to require that a reviewing court defer to a trial court's findings of fact. The majority violates *Collins* by ignoring the trial court's findings, omitting mention of evidence tending to establish defendant's guilt, and fully substituting its judgment for that of the trial court.

---

[7]In response to my pointing out that its citations do not support its decision, the majority observes that I do not cite any cases in which reviewing courts affirmed under comparable facts. That is hardly a defense of the relevance of the majority's own citations. However, the majority is correct that I have declined to search out such cases. My reason is that *Collins* lays out a standard that very clearly controls the outcome here.