# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***People v. Kotlinski*, 2011 IL App (2d) 101251**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN C. KOTLINSKI, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-1251 |
| Filed | October 21, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for resisting a peace officer was reversed where no rational trier of fact could have found that defendant violated section 31-1(a) of the Criminal Code after considering all of the evidence in the light most favorable to the prosecution, including the testimony that the arresting officer was suspicious of a vehicle with five passengers proceeding in the early hours of New Year's Day, he stopped the vehicle after discovering that the registration sticker had expired a few hours earlier, and while trying to determine whether the odor of alcohol he noticed was coming from the driver, defendant, a passenger in the front seat, exited the vehicle and allegedly committed the offense. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 10-CF-3; the Hon. Theodore S. Potkonjak, Judge, presiding |
| Judgment | Reversed. |

Counsel on
Appeal

Christopher R. Smith, of Smith, Johnson & Antholt LLC, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and Kristin M. Schwind, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.

Justices McLaren and Bowman concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Steven C. Kotlinski, appeals from his conviction of obstructing a peace officer in violation of section 31-1(a) of the Criminal Code of 1961 (Code) (720 ILCS 5/31-1(a) (West 2008)), following a jury trial. Because the State failed to prove defendant guilty beyond a reasonable doubt, we reverse.

¶ 2                          BACKGROUND
¶ 3                          The Video
¶ 4    The following facts are taken from viewing People's Exhibit No. 1 in evidence, the unredacted video of the traffic stop effected by Mundelein, Illinois, police officers on New Year's Day 2010 that resulted in multiple charges against defendant. However, we first begin with enough background, learned from the trial transcript, to place the events depicted on the video in context.

¶ 5    The traffic stop commenced shortly after 3 a.m. at Route 45 and Hickory in Mundelein. The video, which includes sound, was shot from Officer Anthony Raciak's squad car. Raciak testified that the camera activates automatically when he turns on his flashing roof lights, although in this case the camera started recording events before he switched on his lights to alert the driver of the car in which defendant was a passenger to pull to the curb. Raciak and the other police officer at the scene, Richard Turek, wore body microphones that transmitted the sound. Raciak and Turek were equipped with Tasers in addition to their guns, batons, and pepper spray. According to an internal Mundelein police department general order admitted into evidence, a Taser is a laser-sighted "stun type device" that fires probes. When the probes hit a human being, they transmit a 26-watt electrical signal that "overrides the body's central nervous system to cause an uncontrollable contraction of muscle." The effect "is to physically debilitate a subject regardless of pain tolerance or mental focus."

¶ 6    Jean Kotlinski, self-employed as a bookkeeper, was the driver of the Ford Expedition that was the subject of Raciak's traffic stop. Her husband, defendant, who was a principal

engineer with Abbott Laboratories, was in the front passenger seat. Their two adult sons, Craig and Corey, were in the backseat. Bernard Neri, a friend of Craig's and Corey's, was also in the backseat, sitting between Craig and Corey. They had left a New Year's Eve party at Jean's sister's home in Mundelein and were going home to Hawthorne Woods. There was snow on the ground, and the temperature was close to zero.

¶ 7 Raciak began tailing the Kotlinski vehicle because he saw five people inside it, which made him suspicious. The Kotlinski vehicle committed no traffic violations, but when Raciak discovered that the license plate sticker had expired several hours earlier, he used that as his reason to stop the vehicle. Raciak testified, "We need a reason obviously to stop the vehicle, but *** what drew my attention to the vehicle was that there were [five] people in it." Because of the number of people in the Expedition, Raciak radioed for backup, and Turek responded to the scene. While Raciak was occupied outside of his squad car, Turek positioned Raciak's car approximately 25 feet behind the Expedition. The camera in Raciak's vehicle caught the action from that vantage point. Turek did not activate the camera in his squad car, which was angled behind Raciak's squad car. The scene was lit with ambient light from the roadway, Raciak's headlights, his flashing roof lights, and a flashlight he carried.

¶ 8 The following is a narrative of what the unredacted video depicts. In the lower right-hand corner of the video are the date and the time, showing the hour, minutes, and seconds in real time as they elapse.

¶ 9 The video opens with Raciak tailing the Kotlinski vehicle. We hear radio traffic inside the squad car and then Raciak makes the traffic stop. He walks to the driver's-side door of the Expedition and asks for Jean's license and insurance card. She is unable to locate a current insurance card, but says she is insured. Raciak informs her that her license sticker is expired. She replies that she has a current one, but not in the car with her. Raciak then says he smells the strong odor of alcohol coming from inside the vehicle, and asks who has been drinking. Jean says she had nothing to drink, she is the designated driver. Defendant, from inside the vehicle, volunteers "I did [drink]." Raciak asks Jean to step out of the vehicle so he can determine whether the odor is coming from her or not. She complies, joking that she is probably old enough to be Raciak's mother.

¶ 10 Raciak positions Jean behind the Expedition. Raciak's back is to the Expedition, and he is facing toward the camera. Jean's back is to the camera. Raciak explains that she will have to perform field sobriety tests so that he can determine that the odor of alcohol is not from her person. In the first test, he has her follow his finger with her eyes. We are unable to see how she performs because her back is to the camera. At one point, the audio cuts out and then returns. Raciak then has her perform a straight-leg-raise test. He demonstrates, and then she commences the test, raising her left leg and counting audibly to 30. Toward the end of this test, the video goes off, so we cannot see the complete test, but we hear her count all the way to 30. The video returns, and Raciak demonstrates the heel-to-toe test and has her perform it, which she does. Raciak then directs her to accompany him back to his squad car for a portable Breathalyzer test.

¶ 11 From the point Jean got out of the Expedition to this point, the video shows no movement from anyone inside the Expedition, and there are no comments.

¶ 12    Raciak and Jean reach the front of his squad car, and he directs her to the middle of the hood. Raciak then holds a black device in front of her face. His back is to the camera, and he is facing toward the Expedition.

¶ 13    At 03:08:40 hours, the front passenger-side door of the Expedition opens, and at 03:08:41 defendant steps out of the vehicle. He does not move away from the doorframe, and he does not say anything. He is facing the camera, looking in the direction of Raciak and Jean.

¶ 14    At 03:08:41 Raciak yells, "Get back in the car!" Raciak fast-walks with his hand on Jean, who is in front of him, to the rear of the Expedition. Raciak yells again, "Get back in the car." Raciak orders Jean to get up against the back fender of the Expedition. He keeps his body against hers. Turek is at the right side of the video, approaching defendant. Turek is yelling "Get back in the car." Jean screams for defendant to get into the car. Defendant says nothing while he is outside the vehicle. At 03:09:02, defendant reenters the Expedition. He says, "I'm in the car. I'm in the f*** car." Raciak and Turek holler "Close the door!" Turek threatens to tase defendant. Jean tells Raciak, "He [defendant] will have a heart attack." Raciak says, "Well, he is going to get tased." At 03:09:28, Turek closes the car door.

¶ 15    At 03:09:38, Raciak handcuffs Jean behind her back. He tells her she is not under arrest, but he is going to arrest defendant for obstructing his investigation. Jean protests and says, "He's in the car." Raciak responds, "He's not. He isn't listening." Raciak places Jean, handcuffed behind her back, into his squad car. Raciak then moves quickly to the Expedition, where he yanks the passenger door open and orders defendant to "get out." Immediately, Raciak dives into the vehicle, his Taser extended. We hear the crackling sound of a Taser, and Raciak pulls defendant from the car and throws him into the snow. Raciak and Turek jump on defendant. We hear Tasers crackling. Defendant moans and says, "I have a heart condition. Call 911." During this phase, the sound goes off again, and then comes back. Once defendant is in handcuffs, Raciak keeps telling defendant to get up. Defendant says, "I can't." Raciak says, "You have to."

¶ 16    Paramedics arrive at the scene, and Raciak releases Jean.[1]


¶ 17                                The Charges

¶ 18    On February 3, 2010, the grand jury indicted defendant on two counts of aggravated battery of a police officer (720 ILCS 5/12-3 (West 2008)), alleging that defendant caused bodily harm to Officer Anthony Raciak by grabbing him and made contact of an insulting or provoking nature by pushing Officer Anthony Raciak. On May 7, 2010, the State charged defendant by information with obstructing a peace officer. The charge read as follows:

    "Steven C. Kotlinsky DOB: 1/24/1956 hereinafter called the defendant(s), did on or about January 1, 2010, in Lake County, Illinois, commit the offense of: obstructing a peace officer (Class A) in violation of 720 ILCS 5/31-1(a), in that the said defendant knowingly obstructed the performance of Officer Anthony Raciak of an authorized act

_____

[1]At the scene, although not on the video, Raciak completed giving Jean the portable Breathalyzer test. She blew 0.

-4-

within his official capacity, being a DUI investigation, knowing Officer Raciak to be a peace officer engaged in the execution of his official duties, in that said defendant exited his vehicle, yelled at Officer Raciak and refused to obey commands by Officer Anthony Raciak to get back in his vehicle."

¶ 19                          The Trial and Posttrial Motions

¶ 20       Defendant's jury trial commenced on August 9, 2010. Raciak was the State's first witness. As we have already recounted his preliminary testimony regarding the reason for the traffic stop, we pick up his testimony immediately after the stop.

¶ 21       Outside the vehicle, Raciak administered the HGN test for jerkiness in the eyes, which would indicate intoxication. Raciak testified that Jean would not "track" his finger, so he did not get an accurate "reading" to determine if she had ingested alcohol. For this reason, he had her perform two more tests, the straight-leg test and the heel-to-toe test. Raciak testified that Jean did not "outright fail" those tests, but she showed "indicators of impairment." For that reason, he intended to give her a portable breath test. He had the device to her face when defendant got out of the Expedition. Raciak testified, "[M]y DUI investigation completely got halted by him stepping out of the vehicle."

¶ 22       According to Raciak, defendant got out of the car "really agitated." Raciak testified that defendant "was in an extremely agitated state. He started walking toward us." According to Raciak, defendant used "expletives." "There was swearing involved," he testified.[2] According to Raciak, "[Defendant] is ignoring our verbal commands and refusing to comply with our orders." Raciak testified that defendant was not "removing his hands from his pockets."[3] "It's a situation," Raciak testified, "where [defendant] could be tased if he is not going to comply with our orders."

¶ 23       Raciak handcuffed Jean and seated her inside his squad car. The prosecutor asked, "Where is your D.U.I.–where is your D.U.I. investigation right now at this point?" Raciak answered, "It is halted. *** Because I have somebody who is clearly obstructing my investigation. I'm not able to complete what I want to do. [Defendant] keeps on interfering with it." Raciak testified that he wanted defendant to step out of the vehicle at this point, and he explained to defendant that if he did not get out of the vehicle, "I am going to put him out of the vehicle." Raciak described how he tried to pull defendant out and testified that defendant grabbed hold of Raciak's left bicep and squeezed and attempted to pull Raciak into the car. During this, defendant pushed Raciak. Raciak testified that he broke away, removed his Taser from its holster, and "put a dot on [defendant's] chest." Raciak testified that, when he fired the Taser into defendant's chest, it was "ineffective" to cause "muscular disruption." Then Raciak and Turek grabbed defendant and "removed" him from the vehicle.

¶ 24       Raciak testified that he and Turek struggled with defendant on the ground before they got him handcuffed. Raciak called for more backup and for paramedics to assess defendant's

---

[2]On the video, defendant exits the vehicle and does not move or say anything.

[3]The video shows that Raciak never ordered defendant to remove his hands from his pockets.

medical condition. In Raciak's opinion, defendant was intoxicated. Raciak then gave Jean the breath test at the passenger side of his squad car. She blew "zeroes," and Raciak gave her a written warning for the expired registration.

¶ 25        On cross-examination, Raciak admitted that, as soon as defendant got out of the car, the first thing anyone said was Raciak telling him to get back inside the car. Raciak said that, when defendant first got back inside the car, he was sitting with his feet outside and the door open. According to Raciak, eventually the door was closed, but not all the way.

¶ 26        Mark Gaunky was the State's second witness. He was a paramedic who assessed defendant at the scene. According to Gaunky, defendant was uncooperative and refused to go to the hospital.

¶ 27        Sergeant Fred Kliora of the Mundelein police department testified next. He arrived on the scene after defendant had been placed in handcuffs. According to Kliora, at that time, defendant was belligerent and using profanity.

¶ 28        Turek testified next for the State. Turek testified that he "observed [defendant] exit the vehicle and immediately start yelling and swearing at us." Turek explained, "[Defendant] immediately started calling us a-holes and asking what the 'F' was going on."[4] According to Turek, he and Raciak walked toward defendant, advising defendant multiple times to get inside the car. When defendant refused to obey, Raciak unholstered his Taser. Turek testified that, when defendant exited his vehicle, Raciak "had to draw his attention completely on [defendant]" and could not finish his investigation. Turek testified that defendant got into the car, but sat with his feet outside. Turek told defendant to sit completely inside the vehicle so he could close the door. According to Turek, defendant called him a "bitch" and asked what he was trying to prove. Turek said he was afraid that defendant was going to attack him. He smelled the odor of alcohol on defendant's breath, and defendant's eyes were "half drooped." According to Turek, defendant and the other passengers in the Expedition were yelling at him until Raciak told defendant to get out of the car. When defendant did not exit the car, Raciak "attempted to remove him from the vehicle." Raciak drew his Taser and "discharged two probes at [defendant]." When the probes had no effect on defendant, Raciak "removed [defendant] from the vehicle." Turek saw Raciak on the ground with defendant, so Turek "activated" the stun drive on his Taser and "drive stunned" defendant two times. Turek described a "drive stun" as "pain compliance." At that point, Turek and Raciak handcuffed defendant. Turek testified that he rode in an ambulance with defendant to Condell Medical Center. He described defendant as agitated and verbally abusive during the ride.

¶ 29        The State rested, and the trial court denied defendant's motion for a directed verdict.

¶ 30        Defendant presented a defense. Bernard Neri, the friend of defendant's sons, testified that he did not hear defendant swear at the police or threaten them; nor did he see defendant leave the passenger side of the vehicle and walk toward the police. Neri testified that the police told defendant to get back in the car. According to Neri, defendant complied, but his feet were dangling "over the edge." Neri testified that the police told defendant to get all the way in the car. Defendant complied, and "the door was closed." Then, a few moments later, Neri

---

[4]On the video, defendant exits the vehicle and does not move or say anything.

-6-

saw an officer "storm" up the side of the car, open the door, and instruct defendant to get out of the car, and then the officer came into the car. Neri heard a clicking noise, and defendant froze. According to Neri, defendant did not struggle with the officer or touch the officer. The officer took defendant outside of the car, where Neri could not see what happened next.

¶ 31    Jean testified to the traffic stop and the field sobriety tests she performed outside the Expedition. She testified that Raciak led her back to his squad car, which was 20 or 25 feet behind the Expedition. Her back was to the Expedition when she heard Raciak and Turek yelling at defendant to get back in the car. Raciak then pushed Jean forcefully toward the Expedition and up against the back of her car. According to Jean, defendant got into the car. She testified that she told Raciak at that point, "I swear he will have a heart attack." According to Jean, Raciak said, "[Defendant] is going to get tased." Jean testified that Raciak handcuffed her and yelled at her to get into his squad car. Next, she watched Raciak "angrily" going toward the Expedition, "really fast." She could not see what happened when Raciak reached the Expedition. She testified that she next saw that Raciak and Turek had defendant outside the Expedition. According to Jean, defendant dropped to the ground and Raciak and Turek "jumped him and started tossing him around like a limp noodle." "They were beating [defendant] up, is what I saw," she testified.

¶ 32    Craig Kotlinski, defendant's son, testified next. Craig was a backseat passenger in the Expedition. He testified that defendant stepped "directly out" of the Expedition, "right next to his passenger door." Craig testified that defendant did not move from that position and did not swear at the police. Craig saw two red dots on defendant's chest and Craig heard defendant say he could not be tased because he had a heart condition.[5] Craig testified that the police were yelling at defendant to get back in the car. According to Craig, defendant got into the car, but the door was still "cracked." An officer told defendant to close the door all the way, and, according to Craig, "the officer closed the door." Then Craig saw Raciak "rush" past his door and "rip" open defendant's door. According to Craig, Raciak grabbed defendant and then there was a clicking noise. Raciak pulled defendant out of the car and threw him in the snow. Craig testified that the police were yelling "Stop resisting," but he did not see defendant doing anything. Craig called 911.

¶ 33    Defendant testified. After Raciak had Jean step outside the car, defendant adjusted the mirrors so he could see both Jean and Raciak. The police did not tell him to stay inside the car. Defendant testified that, when he no longer had them in his sight, he became concerned. Defendant testified that he opened the door to see where his wife was. He got out of the car and stood upright within the open doorframe directly next to his seat. According to defendant, he did not yell at the officers or say anything to anybody. He did not walk toward the officers. He testified that he did not move from his position "one iota." Defendant testified that both officers immediately started yelling in a rude and obnoxious manner for him to get back in the car. According to defendant, he got into the car without turning his back on the officers and had one foot outside the car when Turek told him to close the door. Defendant testified that he told Turek to close the door, which he did. Defendant reattached

---

[5]On the video, defendant is not heard to speak until after he is seated back inside the car.

his seat belt. Then, according to defendant, Raciak reached inside the car, grabbed defendant, and tried to yank him out of the car. Defendant testified that he undid his seat belt and was struck with Taser darts. Defendant said he next knew he was outside the car, being slammed to the ground. Defendant testified that he was tased again and struck in the face with an object. He described being handcuffed and moaning with chest pains and asking to call 911.

¶ 34    Corey Kotlinski, defendant's other son and the third backseat passenger, testified consistently with Neri's, Craig's, and defendant's testimony. Defendant rested, and Raciak testified for the State in rebuttal that, when the dispatcher gave him the name of who owned the vehicle prior to the stop, he did not recognize it.

¶ 35    The jury found defendant not guilty of both counts of aggravated battery and guilty of obstructing a peace officer. The trial court denied defendant's posttrial motions and sentenced defendant to a period of 12 months' conditional discharge and ordered defendant to contribute $250 to Crimestoppers and perform 100 hours of public service work. This timely appeal followed.

¶ 36                                      ANALYSIS

¶ 37    Defendant raises four issues: (1) he was not proved guilty beyond a reasonable doubt; (2) it was plain error for the trial court to allow the State to mislead the jury about the law on obstructing a peace officer; (3) it was plain error for the trial court to allow the State to abandon the charge as pleaded in the information; and (4) the trial court erred in admitting Raciak's legal conclusion that defendant obstructed his investigation. Because we agree that the evidence was insufficient to prove defendant guilty beyond a reasonable doubt, we need not reach defendant's other issues.

¶ 38    When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Collins*, 106 Ill. 2d at 261. The critical inquiry in reviewing the sufficiency of the evidence is whether the evidence reasonably supports a guilty finding regardless of whether the evidence is direct or circumstantial, or whether the trial was by bench or jury. *People v. Lissade*, 403 Ill. App. 3d 609, 612 (2010). If the court determines that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, the defendant's conviction must be reversed. *People v. Clinton*, 397 Ill. App. 3d 215, 220 (2009). Defendant in our case posits that our standard of review is *de novo* based on our supreme court's statement in *People v. Smith*, 191 Ill. 2d 408, 411 (2000): "Because the facts are not in dispute, defendant's guilt is a question of law, which we review *de novo*." Defendant argues that the video in the present case establishes the undisputed facts. While it is true that the video represents the best evidence of what occurred, there was a conflict in the testimony about what happened. Raciak and Turek even contradicted what is plainly on the video. Consequently, the evidence is not undisputed, and we may not apply the *de novo* standard of review.

¶ 39    Defendant was charged with obstructing a peace officer under section 31-1(a) of the Code. Section 31-1(a) provides that a person who knowingly resists or obstructs the performance by one known to the person to be a peace officer of any authorized act within his official capacity commits a Class A misdemeanor. 720 ILCS 5/31-1(a) (West 2008); *People v. Greenwood*, 39 Ill. App. 3d 898, 900-01 (1976). In *People v. Raby*, 40 Ill. 2d 392 (1968), our supreme court held that section 31-1(a) exempts innocent or inadvertent conduct from its proscription. *Raby*, 40 Ill. 2d at 398. The court also established that the term "obstruct" means to "come in the way of." (Internal quotation marks omitted.) *Raby*, 40 Ill. 2d at 399. The court concluded that the statute requires "some physical act or exertion." (Internal quotation marks omitted.) *Raby*, 40 Ill. 2d at 399.

> "Given a reasonable and natural construction, [the statute does] not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe[s] only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest or physically aiding a third party to avoid arrest." (Internal quotation marks omitted.) *Raby*, 40 Ill. 2d at 399.

¶ 40    Here, defendant argues that he neither committed any physical act nor had the requisite mental state. The relevant time period as established by the video was from 03:08:40, when the car door opened and defendant stepped out at 03:08:41, to 03:09:28, when the car door closed. This is the only relevant time period, because the information charged defendant with obstructing by getting out of the car, yelling at Raciak, and refusing commands to get back into the car. By 03:09:28, defendant was inside the car with the door closed. It was then Raciak's own decision to delay his DUI investigation while he arrested defendant for obstructing. So, if defendant committed the crime of obstructing a peace officer, he must have done it within the 47-second interval between when he exited the car and when Turek closed the door.

¶ 41    We have reviewed the unredacted video many times. It contradicts Raciak's and Turek's trial testimony. When defendant stepped out of the car, he remained standing still and mute. He was not acting in an agitated manner. He did not walk toward the officers, he did not yell at them, he did not use profanity, he did not argue with them. Defendant did not say anything until he was inside the car at 03:09:02. Then, in response to the officers' continued yelling to get inside the car, he said "I'm in the car" and "I'm in the f*** car." He also carried on a brief discussion with Turek from inside the car about the field sobriety tests, when his tone of voice could be described as alternately complaining, whining, and quarrelsome.

¶ 42    Defendant contends that this case is governed by *People v. Weathington*, 82 Ill. 2d 183 (1980). In *Weathington*, the supreme court held that the defendant's conduct of refusing to answer booking questions for a few minutes did not violate section 31-1(a). "We think that in these circumstances, where the defendant merely argued with the officer as to when he would answer the booking questions and then, after an indefinite but certainly a brief time, did answer the questions, no offense took place." *Weathington*, 82 Ill. 2d at 187.

¶ 43    Defendant also relies on *Kies v. City of Aurora*, 156 F. Supp. 2d 970 (N.D. Ill. 2001). In *Kies*, the plaintiff filed a complaint against Smith, an Aurora police officer, and the city of

Aurora, alleging use of excessive force, malicious prosecution, and first amendment violations. The district court denied Smith's summary judgment motion on the malicious prosecution claim, because Smith had no probable cause to arrest Kies for obstructing a peace officer. *Kies*, 156 F. Supp. 2d at 982. The evidence in *Kies* showed that the plaintiff appeared at Waldo school to pick up her daughter and saw two boys fighting. *Kies*, 156 F. Supp. 2d at 974. Smith, the school's resource officer, broke up the fight, and in doing so, he hit one of the boys, Perez, in the jaw, jumped on him, and struck him three or four times in the face with a closed fist. *Kies*, 156 F. Supp. 2d at 974. The plaintiff asked Smith why he hit the boy, and she continued to walk alongside the boy while Smith dragged Perez to the school entrance. *Kies*, 156 F. Supp. 2d at 974-75. The plaintiff continually asked Smith if she could make sure Perez was okay, and Smith told her to go home. *Kies*, 156 F. Supp. 2d at 975. When the plaintiff stooped over to ask Perez if he was okay, Smith slapped her face. *Kies*, 156 F. Supp. 2d at 975. Later, after the plaintiff made an excessive-force complaint against Smith, Smith charged her with obstructing. *Kies*, 156 F. Supp. 2d at 975.

¶ 44      The district court recognized that Illinois law requires a physical act that impedes, hinders, interrupts, prevents, or delays the performance of an officer's duties. *Kies*, 156 F. Supp. 2d at 981. The court found that it was undisputed that the plaintiff never touched Smith or Perez throughout the incident and, thus, there was no physical act of resistance. *Kies*, 156 F. Supp. 2d at 981. Smith maintained that, in addition to arguing with him, the plaintiff "committed the physical acts of standing face-to-face with him and running afoot [*sic*] with him," as well as physical resistance in the form of disobeying his orders to go home. *Kies*, 156 F. Supp. 2d at 983. The court disagreed and found that the case involved "mere verbal confrontation at most." *Kies*, 156 F. Supp. 2d at 983. The court then considered what it called the "second prong" of the obstruction inquiry, whether the plaintiff's actions imposed an obstacle that impeded, hindered, interrupted, prevented, or delayed Smith's performance of his duties, and the court determined that the plaintiff did not delay or hinder Smith, as he never stopped walking except perhaps when he slapped the plaintiff in the face. *Kies*, 156 F. Supp. 2d at 983.

¶ 45      There are subtle but salient differences between our case and both *Weathington* and *Kies*. In *Weathington*, the defendant's short refusal to answer booking questions was unaccompanied by any physical act whatsoever, and in *Kies*, while there was some physical activity–running "afoot" with the officer–Smith's duties were not interrupted. Here, two things occurred: (1) defendant got out of his car, and (2) Raciak halted giving Jean the portable Breathalyzer test. However, the emphasis on whether defendant committed a physical act might be misleading, because the issue is whether defendant's conduct subjected him to arrest. See *People v. Bohannon*, 403 Ill. App. 3d 1074, 1077 (2010). The mere act of stepping outside the car was not an act of obstruction, because Raciak never told defendant he had to stay inside the car. Thus, we are required to look at the effect of defendant's conduct. Without deciding whether the act of getting out of the car was a physical act within the meaning of the statute, we conclude that it did cause a brief interruption of Raciak's duties. This is what the State argued at trial. On appeal, the State has all but abandoned this argument in favor of arguing that the obstruction was defendant's refusal to obey the commands to get back in the car. We will examine the State's current obstruction argument

and then return to our discussion of the interruption factor.

¶ 46    The State maintains that "[d]efendant's yelling at the police officers coupled with his refusal to obey the officers' commands to get back in the vehicle constituted obstruction of a peace officer." As we noted earlier, the video controverted Raciak's and Turek's testimony that defendant was yelling at them before he got back inside the car. That strips the State's argument to defendant's supposed refusal to get back in the car.[6]

¶ 47    Passive acts that impede an officer's ability to perform his duties, such as repeatedly refusing an order to exit a vehicle, can be a violation of section 31-1(a). *People v. Ostrowski*, 394 Ill. App. 3d 82, 98 (2009). The State relies on *People v. Synnott*, 349 Ill. App. 3d 223 (2004), where the defendant verbally argued his right to refuse to comply with the officer's orders to step out of his car and grabbed onto the steering wheel to demonstrate his refusal. *Synnott*, 349 Ill. App. 3d at 224. If the refusal to exit a vehicle can be a violation, can a refusal to get into a vehicle likewise be an obstruction? As this court said in *Synnott*, "the word 'act' is used broadly and is understood to include 'a failure or omission to take action.' " *Synnott*, 349 Ill. App. 3d at 227. We said that *Raby*'s definition of obstruct–"to be or come in the way of" (emphasis omitted)–connotes both obstruction through motion and obstruction by remaining stationary. (Internal quotation marks omitted.) *Synnott*, 349 Ill. App. 3d at 227. Yet, *Synnott*, where the defendant remained stationary, is distinguishable from the instant case, because the defendant in *Synnott* also grabbed the steering wheel with both hands. Thus, in *Synnott*, defendant's conduct amounted to more than remaining stationary.

¶ 48    The State emphasizes that Raciak and Turek issued defendant "multiple" commands to get back inside his car before defendant complied. What the State characterizes as a prolonged refusal to obey the officers' commands to get back inside the car was 21 seconds. Defendant got out of the car at 03:08:41. Raciak's first command to get back in the car was made at 03:08:41. Defendant was back inside the car at 03:09:02. In *Ostrowski*, the defendant impeded the officers' ability to arrest him by struggling for three to four minutes, and he was properly found guilty of resisting a peace officer. *Ostrowski*, 394 Ill. App. 3d at 98. In *People v. Comage*, 241 Ill. 2d 139 (2011), our supreme court held that the defendant did not obstruct justice when he threw a crack pipe and push rod over a fence, thus delaying the police investigation by 20 seconds. *Comage*, 241 Ill. 2d at 150. In *People v. Berardi*, 407 Ill. App. 3d 575 (2011), a city alderman's refusal to leave a private office space did not violate section 31-1(a) where his initial refusal to leave was based on his belief that he had a legal right to be present and his acquiescence in the order to leave was almost immediate. *Berardi*, 407 Ill. App. 3d at 582. "Although both parties repeated themselves multiple times, the encounter lasted only a short time." *Berardi*, 407 Ill. App. 3d at 582. The court observed that "[t]he recitation of the event takes longer than the tape establishes the incident actually lasted." *Berardi*, 407 Ill. App. 3d at 584. The same is true in our case.

¶ 49    Our case is closer to *Comage* and *Berardi* than to *Ostrowski*. In the present case,

---

[6]Raciak admitted that he never told defendant that he could not get out of the car. Therefore, when defendant opened the door and stood outside of the car, he was not disobeying any order.

defendant delayed only 21 seconds before he complied. Even enlarging the time to when Turek closed the car door at 03:90:28, the elapsed time was only 47 seconds. Bearing on those 47 seconds were the circumstances that it was after 3 a.m., it was close to zero degrees, both officers were screaming at defendant and threatening to tase him, his wife was screaming at him, and defendant appeared intoxicated.

¶ 50    In any event, we believe the issue about defendant's refusal to obey commands to get back in the car is an obfuscation. The State attempts to package this case neatly into the *Ostrowski*-type scenario, where it does not fit. When we look at the instant facts, we see that the precipitating event was not the command to get back in the car, but defendant's leaving the car. Any perceived delay in defendant's returning to his car did not obstruct Raciak's DUI investigation, because it was already interrupted. As soon as defendant stepped out of the car, Raciak halted the breath test to issue the first command to return inside the vehicle. The real question posed by this case is whether defendant obstructed Raciak's investigation when Raciak halted giving Jean the Breathalyzer to deal with defendant's presence outside the vehicle. However, the question of defendant's guilt cannot be judged solely by the effect of his action in getting out of the car, which was to interrupt the DUI investigation for 21 seconds. More specifically, the issue is whether the State proved beyond a reasonable doubt that defendant possessed the requisite mental state.

¶ 51    Cause and effect are what the State argued at trial. Those are insufficient, standing alone, because an element of the crime is that defendant knowingly obstructed. Courts have held that resisting or obstructing a peace officer is a specific intent crime. *People v. Jones*, 67 Ill. App. 3d 477, 478 (1978) ("[R]esisting a peace officer [is a] specific intent crime[ ] requiring proof that the defendant acted knowingly."); *People v. Greenwood*, 39 Ill. App. 3d 898, 901 (1976) ("In order for the State to establish a violation of [section 31-1(a)], it must prove beyond a reasonable doubt that the defendant had the necessary requisite specific intent, in that the defendant acted knowingly.").

¶ 52    For us to resolve whether the State in our case proved that defendant acted with the requisite mental state, we must first examine what the *Jones* and *Greenwood* courts meant when they said that obstructing or resisting a peace officer is a specific intent crime. The way the term "specific intent" has most commonly been used in American law is to designate a special mental element that is required above and beyond any mental state required with respect to the *actus reus* of the crime. *People v. Robinson*, 379 Ill. App. 3d 679, 684 (2008). An example is common-law burglary, which requires a breaking and entry into the dwelling of another, but in addition to the mental state connected with those acts, the State must also establish that the defendant acted with intent to commit a felony therein. See *Robinson*, 379 Ill. App. 3d at 684. However, there are other usages of the term "specific intent." The term is sometimes used to refer simply to a mental state of knowledge or intent. *Robinson*, 379 Ill. App. 3d at 683. Under another view, "specific intent" has essentially the same meaning as "intent." *Robinson*, 379 Ill. App. 3d at 683-84. In *Robinson*, we said that it is preferable to reserve the term "specific intent" for crimes that do not require merely a knowing or intentional act, but that require proof of an additional special mental element. *Robinson*, 379 Ill. App. 3d at 684.

¶ 53    With this background, we believe that the *Jones* and *Greenwood* courts used the term

"specific intent" to refer to a mental state of knowledge rather than to say that the obstruction statute has an element that is required above and beyond the mental state of knowledge. In other words, all that the courts in *Jones* and *Greenwood* were expressing is that a defendant must act with a mental state. We come to this conclusion because the legislature expressly provided that the mental state for obstructing a peace officer is knowledge, and we may not read any additional mental state, such as criminal purpose, into the statute. *People v. Wright*, 194 Ill. 2d 1, 29 (2000). If the legislature had intended to make obstructing a peace officer a specific intent crime, it would have provided that a defendant must commit an act knowingly with the intent to obstruct or resist.

¶ 54    We now look at what the mental state of knowledge entails. The legislature provided that a person knows, or acts knowingly or with knowledge of:

"(a) The nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

(b) The result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct.

Conduct performed knowingly or with knowledge is performed wilfully, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning." 720 ILCS 5/4-5 (West 2008).

Subparagraph (b) applies in our case, because section 31-1(a) of the Code does not prohibit any particular act, only the result of obstructing. When an offense is defined in terms of a particular result, a person acts knowingly when he is " 'consciously aware' " that his conduct is " 'practically certain' " to cause the result. *People v. Herr*, 87 Ill. App. 3d 819, 821 (1980).[7] "Knowledge is similar to intent in the sense that conscious awareness is inherent in acting purposely but is distinguishable from intent in that it does not require a showing of conscious objective or aim on the part of the accused." 1 John F. Decker, Illinois Criminal Law § 2.33, at 2-67 (2d ed. 1993). "Knowledge," for purposes of criminal liability, probes into what the accused was "subjectively, consciously aware of." 1 John F. Decker, Illinois Criminal Law § 2.34, at 2-69 (2d ed. 1993). Therefore, we have to contrast criminal knowledge, which is subjective, with the ideal reasonable man in tort law (see *Kuhn v. Goedde*, 26 Ill. App. 2d 123, 129 (1960)), whose standard is objective. *Williams v. Brown Manufacturing Co.*, 45 Ill. 2d 418, 424 (1970); *Aetna Casualty & Surety Co. v. Dichtl*, 78 Ill. App. 3d 970, 975 (1979) (the mental state of the reasonable-man actor is not determinative).

¶ 55    By its very nature, knowledge ordinarily is proved by circumstantial evidence. *In re Keith C.*, 378 Ill. App. 3d 252, 260 (2007). The State must present sufficient evidence from which an inference of knowledge can be made, and any such inference must be based on established facts and not pyramided on intervening inferences. *Keith C.*, 378 Ill. App. 3d at 260. Several

---

[7]The trial court instructed the jury on the definition of knowingly in subparagraph (b) after the jury sent out a note asking for the definition.

examples will illustrate this concept. In *Keith C.*, the victim was parking her car in her garage when one of several boys, including the respondent, hurled a brick that shattered her windshield and injured her. On appeal, the respondent argued that whoever threw the brick could not have been practically certain that his conduct would cause bodily harm. *Keith C.*, 378 Ill. App. 3d at 260. The appellate court disagreed and added that the victim's car door was open when the brick was thrown, leaving her unprotected and more susceptible to injury, and the brick was thrown with sufficient force to break the windshield. *Keith C.*, 378 Ill. App. 3d at 261. The court in *Keith C.* cited *People v. Hauschild*, 364 Ill. App. 202 (2006), *rev'd in part on other grounds*, 226 Ill. 2d 63 (2007), in which the defendant shot a homeowner's dog during a home invasion. The appellate court held that it was not unreasonable for the jury to conclude that the defendant or his accomplice knew that the dog remained in the bedroom during the shooting where the defendant knew that the dog was in the bedroom, the room was pitch black, a struggle between the defendant and the homeowner ensued, and the defendant shot " 'blindly' " during the struggle. *Keith C.*, 378 Ill. App. 3d at 261. In *Herr*, the defendant was consciously aware that her conduct was practically certain to cause great bodily harm where she placed her infant in steaming hot water for 15 minutes, even though the infant was screaming and kicking. *Herr*, 87 Ill. App. 3d at 822.

¶ 56    In all of these cases, the defendants' acts were accompanied by knowledge of established facts. In *Keith C.*, whoever threw the brick knew that the brick was thrown with enough force to break the windshield, the car was occupied, and the victim's window was open, exposing her. In *Hauschild*, the defendant knew that the dog was in the bedroom, the bedroom was pitch black, and shots were fired blindly during a struggle. In *Herr*, the defendant knew that the water was hot enough to steam and knew that the child screamed and kicked when held in the water. None of these cases depended upon the inference of knowledge drawn from other inferences. The victim's presence in the car was an established fact in *Keith C.*; the dog's presence in the bedroom was an established fact in *Hauschild*; the steaming water and the child's screams were established facts in *Herr*.

¶ 57    In contrast, in our case, any inference that defendant knew that his act of getting out of the car was practically certain to result in the interruption of Raciak's DUI investigation must be pyramided on another inference, that he knew that Raciak was still administering a field sobriety test to defendant's wife. According to the video, defendant stayed inside his car for over four minutes without interfering either verbally or physically with Raciak's investigation while Raciak and Jean were within his sight next to the Expedition. Defendant testified that he was able to watch them by adjusting the car's mirrors. It was only when Raciak removed Jean from defendant's sight to his squad car 25 feet away that defendant stepped out of the car. The only reasonable inference that the jury could draw was that defendant stepped out of the car because he could not see what was happening with his wife, *which means he did not know what Raciak was doing*. Indeed, at trial, the State conceded that defendant's purpose in exiting the car was to see what was going on with his wife. By standing next to the car, not advancing toward Raciak, not speaking, not gesturing, defendant evinced no awareness that he was obstructing Raciak's investigation, any more than watching from inside the vehicle had obstructed it.

¶ 58    In *People v. Schmidt*, 392 Ill. App. 3d 689 (2009), the defendant did not act knowingly

when he drove a stolen sport utility vehicle at a high rate of speed, ran a stop sign, and "barreled" through a crosswalk, striking a family of pedestrians, killing one of them. *Schmidt*, 392 Ill. App. 3d at 706. The court remarked that the defendant's speed was not proved, and no evidence was presented that the residential area that the defendant drove through was presently crowded with people. *Schmidt*, 392 Ill. App. 3d at 706. Therefore, the defendant did not know of the existence of the fact–people in the crosswalk–that caused the result. On the other hand, the court held that, moments before the defendant collided with the family in the crosswalk, the defendant acted knowingly when he injured a policeman. The policeman was standing with his left hip against the driver's-side panel of the vehicle when the defendant sped away. *Schmidt*, 392 Ill. App. 3d at 704. The court noted that the defendant was aware of the policeman's location and his status as an officer before he drove away. *Schmidt*, 392 Ill. App. 3d at 704. Here, defendant was aware of Raciak's status as a policeman at all times during the stop, but at the moment defendant got out of the car, he was not aware of what Raciak was doing.

¶ 59                                    CONCLUSION

¶ 60        We conclude that, viewing all of the evidence in the light most favorable to the State, no rational trier of fact could have found that defendant violated section 31-1(a). Accordingly, defendant's conviction is reversed.


¶ 61        Reversed.

-15-