# Illinois Official Reports

## Appellate Court

---

### *People v. Swenson*, 2019 IL App (2d) 160960

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RORY JOHN SWENSON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0960 |
| Filed | February 28, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 15-CF-2814; the Hon. Fernando L. Engelsma, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Erin S. Johnson, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SPENCE delivered the judgment of the court, with opinion. Justices McLaren and Jorgensen concurred in the judgment and opinion. |

**OPINION**

¶ 1     In the direct appeal of his disorderly-conduct conviction, defendant, Rory John Swenson, argues that the State failed to prove him guilty beyond a reasonable doubt and, further, that his conduct was protected by the first amendment. We affirm.

¶ 2                       I. BACKGROUND

¶ 3     On February 8, 2016, defendant was charged by information with one count of attempted disorderly conduct (attempt to convey a threat) (720 ILCS 5/8-4(a), 26-1(a)(3.5) (West 2014)), one count of phone harassment (*id.* § 26.5-2(a)(2)), and one count of disorderly conduct (*id.* § 26-1(a)(1)). The charges stemmed from a phone call that defendant made on December 7, 2015, to the Keith Country Day School (the school) and a conversation that he had with a school employee.

¶ 4     The following evidence was presented at defendant's bench trial. Monica Krysztopa testified that she was the director of advancement at the school. On December 7, 2015, defendant called the school and left a voice mail message indicating that he wanted to discuss admissions at the school. He provided a phone number and asked that his call be returned. Shortly thereafter, Krysztopa returned defendant's call and spoke with him. Defendant told Krysztopa that he was interested in enrolling his second-grade son at the school, and according to Krysztopa, he "immediately went into a battery of questions about the protocol at [the] school for handling things that were related to guns and shooting." He also told Krysztopa that he had previously attended the school but had been kicked out. Krysztopa testified:

> "[H]e basically wanted to know how prepared I would be if he or anyone who arrived on our campus with guns? And do we have bullet proof windows at our secretary's desk? Are our doors bullet proof? Where do our faculty members stand when we do a lockdown when there is an intruder in our building? Where do they stand in position in a classroom? Do we arm our faculty? How would our faculty defend themselves against an armed intruder? There were multiple questions."

Defendant also mentioned that "the United States was full of socialists and KGB members." He asked about truancy laws. He also asked if she "knew the number of *** school shootings that had taken place in the United States and if [she] knew the success rate of shooters once they were on campus." Defendant brought up the San Bernardino shooting, which had happened one week earlier. Krysztopa testified that defendant stated: "Is [the school] prepared if that would happen in your campus today?" Krysztopa testified: "He asked me if I was prepared to have the sacrificial blood of the lambs of our school on our, on my hands, if this were to happen and what would I do?" Defendant asked, "if he were to show up at the campus with a gun what would be the protocol of [the] school?" Defendant also asked if the students were given "PEZ dispensers to defend themselves." He asked if the teachers carried guns, and he talked about "a number of guns and their success rate in kill." He asked how long it would take police to get to the school in the event of a shooting. At one point, defendant "was talking about when you shoot and kill children and you're looking them in the eye and their innocence and the pillows of laying their heads down at night and then you have a shooter who shoots them in the face, you know, what does that do for [her] as a school?" He asked her if she would "sniff the pillow." She stated that she thought he wanted to know "if [she] would sniff the pillow of their innocence after they've been dead."

- 2 -

¶ 5     Krysztopa testified that, based on her conversation with defendant, she believed that defendant was on the school campus, particularly due to his comment about whether she was "prepared to have the blood of the sacrificial lambs on [her] hands that day and if [they] were prepared to handling [*sic*] something like San Bernardino that day." In addition, defendant had stated that he was familiar with the woods around the school campus because he had gone to school there. Krysztopa described the campus as "very large" with "a lot of trees and wooded areas behind a neighborhood."

¶ 6     Krysztopa testified that she texted the head of the school. She told her that someone was talking about guns and the safety of the school, and she told her to call 911. The head of the school called 911 and placed the school on a "soft lockdown." After an officer had been dispatched to defendant's home and two officers were present at the school, the children were dismissed.

¶ 7     Krysztopa testified that her conversation with defendant lasted 15 to 20 minutes. Defendant ended the conversation by saying that "he had to go." During the conversation, Krysztopa took notes. Krysztopa identified her notes as State exhibit No. 2, and she used them to refresh her recollection while testifying. Krysztopa testified that the conversation left her "very shook up."

¶ 8     On cross-examination, Krysztopa testified that defendant told her that his son was currently enrolled in public school and that he was looking to move him to her school. He mentioned that he was concerned about the lack of security at his son's current school. He never told her that he had a gun; he asked what would happen if someone went to the school with a gun. He asked her if she knew the success rate of a "hitter" who showed up at school with a gun, and he told her that it was 80%. The school went into a soft lockdown because she believed that defendant was on campus. But defendant never said that he was on campus.

¶ 9     Rockford police officer Michael Clark testified that, on December 7, 2015, at about 2:30 p.m., he was dispatched to defendant's apartment to investigate a report of a threatening phone call that had been made to the school. When he arrived, he telephoned defendant using a phone number that had been given to him by the dispatchers. No one answered the call, but about a minute later, defendant exited the building and approached Clark. Clark patted down defendant and told him that he was there to investigate a threatening phone call that had been made to the school. Defendant admitted that he had made the call. He told Clark that he had called to find out about security at the school. He also told Clark that he had asked if the school had armed security guards and bulletproof glass. Clark placed defendant in the back of his squad car. Defendant was not placed in handcuffs. At 3:20 p.m., after receiving a phone call from police officer Mace, Clark arrested defendant.

¶ 10    On cross-examination, Clark testified that defendant cooperated with him at all times. Defendant told him that he was considering transferring his son to the school and that he wanted to know about the school's security. When defendant was arrested, he asked Clark to get his son from his apartment. Clark asked defendant if there were any weapons in the apartment, and defendant told him that there were not. Clark went into the apartment to get defendant's son. He did not see any weapons in plain view.

¶ 11    At the close of the State's evidence, defendant moved for a directed finding. The trial court granted the motion as to the charge of phone harassment because it was Krysztopa who called defendant. The trial court denied the motion with respect to the remaining charges.

¶ 12    Defendant testified that in December 2015 his son was seven years old and attended a Rockford public elementary school. At that time, defendant was interested in enrolling him in a "privatized institution of learning where they weren't bound by budgeting restrictions used as the excuse not to protect our children." He left a voice mail message with the school. He testified that his intent in making the call was to enroll his son in the school. When Krysztopa called him back, he told her why he wanted to enroll him in the school. According to defendant, he asked first about financial aid and then about security. He testified:

> "And then my other question was what is the security protocol, even about me talking to you over the phone, about security protocols? If need be, when I come in to fill out the financial aid information, I can talk to you about it then is exactly what I said to her."

Defendant testified that he never threatened anyone at the school. He never said that he was bringing a weapon to the school. He did not have a firearm owner's identification card, nor did he own any weapons.

¶ 13    In making its ruling, the court stated as follows. First, with respect to the credibility of the witnesses, the court found Clark and Krysztopa to be credible. The court further found that defendant's testimony, in parts, was also credible. To the extent that defendant's testimony conflicted with Krysztopa's, the court found Krysztopa's testimony to be more credible. Next, with respect to the charge of attempted disorderly conduct, in that defendant attempted to convey a threat, the court found defendant not guilty. With respect to the charge of disorderly conduct, however, the court found defendant guilty. The court found that defendant knowingly committed an unreasonable act given the statements that he made to Krysztopa and that Krysztopa was alarmed and disturbed. The court stated:

> "Would you as a parent have the right to know some things about the school? Yes, but not in this fashion. The hallmark of this ruling here is reasonableness. We try to look at things reasonably and this was just an unreasonable act. Would a reasonable person be alarmed and disturbed? Yes. A reasonable person would be alarmed and disturbed. And I so find.
>
> I find that the act was done knowingly. Even if it wasn't done knowingly in the sense of making a threat to the school but if the act was done knowingly and was the act an unreasonable act? Yes. The conversation is outlined by a credible witness Krysztopa and was unreasonable. It went too far for that.
>
> So it is disorderly conduct."

¶ 14    The trial court imposed a sentence of 12 months' probation. Following the denial of his motion for a new trial, defendant timely appealed.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant first argues that he was not proved guilty of disorderly conduct beyond a reasonable doubt because the State failed to prove that he acted knowingly.

¶ 17    A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When we review a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 18    Defendant was charged with violating section 26-1(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/26-1(a)(1) (West 2014)), which provides as follows:

> "(a) A person commits disorderly conduct when he or she knowingly:
>
>   (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace[.]"

To prove defendant guilty beyond a reasonable doubt of disorderly conduct, the State had to prove that defendant "knowingly" committed an act in an unreasonable manner that he "knew or should have known" would tend to alarm or disturb another so as to cause a breach of the peace. *People v. Raby*, 40 Ill. 2d 392, 397 (1968).

¶ 19    Defendant argues that the State failed to prove that he acted knowingly. More specifically, defendant argues that the State was required to prove that he was consciously aware that his conduct was practically certain to alarm or disturb another and cause a breach of the peace. We disagree.

¶ 20    In support of his argument, defendant relies on *People v. Kotlinski*, 2011 IL App (2d) 101251. *Kotlinski* involved section 31-1(a) of the Criminal Code, which provided that "[a] person who *knowingly resists or obstructs* the performance by one known to the person to be a peace officer *** of any authorized act within his official capacity commits a Class A misdemeanor." (Emphasis added.) 720 ILCS 5/31-1(a) (West 2008). Relying on the statutory definition of knowingly,[1] this court found that the evidence had to establish that the defendant was consciously aware that his conduct was practically certain to obstruct. *Kotlinski*, 2011 IL App (2d) 101251, ¶ 54.

¶ 21    However, unlike the statute at issue in the present case, the statute at issue in *Kotlinski* made clear that the word "knowingly" modified the words "resists or obstructs." Here, to accept defendant's interpretation of the statute, we would have to find that the word "knowingly" in the introductory clause of section 26-1(a)(1) modifies every element in the clause "[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1) (West 2014). But, in *Raby*, our supreme court made clear that such an interpretation was not intended. There, the court addressed a claim that the provision reached conduct with first-amendment protection. It looked to the committee comments to determine the provision's breadth, quoting them as follows:

> " 'Section 26-1(a) is a general provision intended to encompass all of the usual types of "disorderly conduct" and "disturbing the peace." Activity of this sort is so varied and contingent upon surrounding circumstances as to almost defy definition. *** In addition, the task of defining disorderly conduct is further complicated by the fact that the type of conduct alone is not determinative, but rather culpability is equally

---

[1]A person acts knowingly or with knowledge of "[t]he result of his or conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2014).

dependent upon the surrounding circumstances. *** These considerations have led the Committee to abandon any attempt to enumerate "types" of disorderly conduct. Instead, another approach has been taken. As defined by the Code, the gist of the offense is not so much that a certain overt type of behavior was accomplished, as it is *that the offender knowingly engaged in some activity in an unreasonable manner which he knew or should have known would tend to disturb, alarm or provoke others*. The emphasis is on the unreasonableness of his conduct and its tendency to disturb.' " (Emphasis added.) *Raby*, 40 Ill. 2d at 396-97 (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments (Smith-Hurd 1964)).

Thus, although the *scienter* requirement for the doing of the act in an unreasonable manner is one of knowingness, the *scienter* requirement for " 'tend to disturb, alarm or provoke' " is " 'knew or should have known.' " *Id.* at 397; see *People v. Albert*, 243 Ill. App. 3d 23, 27 (1993) (because the defendant "performed her shouting knowingly and also knew or should have known that such noise likely would disturb people such as the complainant," she could properly be found guilty of disorderly conduct).

¶ 22    Given the supreme court's clear statement, the question is whether the evidence was sufficient to establish beyond a reasonable doubt that defendant knowingly committed an unreasonable act that he knew or should have known would tend to alarm or disturb another so as to provoke a breach of the peace. In making this determination, we note the following:

"The types of conduct included within the scope of the offense of disorderly conduct almost defy definition. [Citation.] As a highly fact-specific inquiry, it embraces a wide variety of conduct serving to destroy or menace the public order and tranquility. [Citation.] [C]ulpability *** revolves not only around the type of conduct, but is equally dependent upon the surrounding circumstances. [Citation.] Generally, to breach the peace, a defendant's conduct must threaten another or have an effect on the surrounding crowd. [Citation.] However, a breach of the peace can occur without overt threats or profane and abusive language. [Citation.] In addition, it need not occur in public." (Internal quotation marks omitted.) *People v. Pence*, 2018 IL App (2d) 151102, ¶ 17.

¶ 23    Here, viewed in the light most favorable to the State, the evidence allowed the trial court to infer that defendant had the requisite mental state. Although inquiring generally about a school's security protocol is not unreasonable in itself, the nature of defendant's questions and comments, considered in their totality, clearly exceeded the bounds of reasonableness. For instance, although defendant never stated that he was on the campus, he let Krysztopa know that he was familiar with the campus. Defendant conveyed a detailed knowledge of guns and school shootings, and he asked what would happen "if *he* were to show up at the campus with a gun." (Emphasis added.) Defendant reminded Krysztopa about the recent San Bernardino shooting and asked, "Is [the school] prepared if that would happen in your campus *today*?" (Emphasis added.) Defendant also asked how long it would take police to get to the school in the event of a shooting. He asked whether there were bulletproof windows at the secretary's desk and whether the doors were bulletproof. He asked where faculty members stood in the event of a lockdown and whether they were armed. Defendant warned Krysztopa that "the United States was full of socialists and KGB members." Defendant also made disturbing comments about shooting children. Krysztopa testified that defendant talked "about when you shoot and kill children and you're looking them in the eye." He asked her "if [she] would sniff

the pillow of their innocence after they've been dead." He also asked her "if [she] was prepared to have the sacrificial blood of the lambs of [the] school *** on [her] hands." Thus, although defendant claims that he "was only inquiring about the security at the school in relation to his concerns for his son's safety," his comments as a whole were broader, morbid, and clearly inappropriate to his purported objective.

¶ 24 Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that defendant knowingly acted unreasonably and knew or should have known that his act would alarm or disturb Krysztopa so as to breach the peace.

¶ 25 Defendant next argues that, because his words were not lewd, profane, obscene, libelous, "fighting words," or "true threats," they were protected by the first amendment, such that the disorderly-conduct statute cannot be read as criminalizing them. We disagree. Words that are expressed "in such an unreasonable manner as to provoke, make or aid in making a breach of peace [do] not come within the protections of the first amendment." *City of Chicago v. Morris*, 47 Ill. 2d 226, 230-31 (1970). Indeed, as Justice Holmes famously observed, one cannot falsely yell "fire" in a crowded theater. *Schenck v. United States*, 249 U.S. 47, 52 (1919).

¶ 26 In *Morris*, our supreme court relied on *United States v. Woodard*, 376 F.2d 136 (7th Cir. 1967). There, the defendants were convicted of disorderly conduct. *Id.* at 138-39. One of the defendants, Ranier Seelig, was convicted for jumping to his feet during a congressional hearing and shouting, " 'Being an American citizen, I don't have to sit here and listen to these lies.' " *Id.* at 139. He was warned to keep quiet. *Id.* When he continued his shouting, he was removed from the building. *Id.* The Seventh Circuit rejected Seelig's argument that his conduct was protected by the first amendment. *Id.* at 142-43. The court stated:

> "First amendment rights are 'not absolute at all times and under all circumstances.' [Citation.] Conceding that the defendant Seelig was attempting to voice a protest against the *** proceedings, Seelig had no constitutional right to voice his protest in the manner he adopted. The first amendment does not guarantee the right of a spectator to shout during a legislative hearing so as to disrupt the orderly processes of the proceeding." *Id.* at 142.

¶ 27 Here, defendant, like Seelig, argues that his conduct was protected by the first amendment in that he merely "had a conversation with Krysztopa about the security at Keith School." This is flagrantly disingenuous. As noted, defendant did not merely engage in a civil conversation concerning a matter of public interest. Nor was he "peacefully expressing unpopular views." (Internal quotation marks omitted.) *Raby*, 40 Ill. 2d at 397. Rather, he subjected Krysztopa to a lengthy interrogation that was disturbing, morbid, and well beyond a reasonable concern for school security, causing a police response and a school lockdown. As in *Woodard*, although defendant's concern might have been reasonable, his manner of expressing it was not, and he provoked a breach of the peace. See *Pence*, 2018 IL App (2d) 151102, ¶ 17 ("a breach of the peace can occur without overt threats or profane and abusive language" (internal quotation marks omitted)). It thus was not constitutionally protected.

¶ 28                                    III. CONCLUSION

¶ 29 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166,

178 (1978).

¶ 30          Affirmed.