2025 IL App (2d) 240054-U
No. 2-24-0054
Order filed January 21, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-1833 |
| TRAVIS D. OLIVER, | ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) Sufficient evidence supported defendant's conviction of aggravated driving under the influence, given defendant's speeding; his bloodshot, glassy eyes and odor of an alcoholic beverage; his poor performance on field sobriety tests; and his refusal to provide a breath test at the police station. (2) The trial court did not err in giving a nonpattern jury instruction that the results of a portable breath test are not admissible at trial to prove a defendant's blood alcohol content.

¶ 2     Defendant, Travis D. Oliver, appeals his conviction of aggravated driving under the

influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2020)). He contends that (1) the

evidence was insufficient to prove that he was under the influence of alcohol and (2) the trial court

erred in giving the jury a nonpattern instruction on the admissibility of a portable breath test to

prove a defendant guilty of DUI. Because the evidence was sufficient and there was no reversible instructional error, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      The State charged defendant with two counts of aggravated DUI (625 ILCS 5/11-501(a)(2) (West 2020)) and one count of driving while license revoked (625 ILCS 5/6-303(a) (West 2020)).

¶ 5      The following facts were established at defendant's jury trial. Officer Kevin Bayer of the Montgomery Police Department, the only witness at trial, testified that at about 9:27 p.m. on September 21, 2020, he was on patrol when his squad car radar indicated an oncoming vehicle traveling 44 miles per hour in a 30-mile-per-hour zone. After the vehicle passed, Bayer made a U-turn and activated his emergency lights. The vehicle activated its turn signal, pulled into a parking lot, and parked in a marked parking spot.

¶ 6      When Bayer approached the vehicle, he saw defendant sitting in the driver's seat and a female sitting in the front passenger seat. Bayer asked defendant for his driver's license and proof of insurance, and defendant handed him an Illinois identification card. Bayer returned to his squad car and ascertained that defendant's driver's license was revoked.

¶ 7      Bayer then returned to defendant's vehicle and asked him to exit. When defendant stepped out of his vehicle, Bayer immediately observed that defendant's eyes were bloodshot and glassy. Bayer also smelled a strong odor of an alcoholic beverage on defendant's breath. According to Bayer, bloodshot and glassy eyes are an indicator that a person is under the influence of alcohol. However, he admitted that "other things" can cause a person's eyes to be bloodshot and glassy. According to Bayer, defendant was "leaning slightly, at times leaning up against his vehicle while he was speaking with [Bayer]." When Bayer asked defendant how many drinks he had consumed that night, defendant said he had two drinks about 20 to 30 minutes before the stop.

¶ 8     Bayer then had defendant perform several field sobriety tests in an area between the squad car and defendant's vehicle.  Bayer described the area as level, dry, and free of debris.  According to Bayer, the weather was warm, dry, and not windy.

¶ 9     The first field sobriety test administered by Bayer was the horizontal gaze nystagmus (HGN) test.  According to Bayer, he had conducted over 30 HGN tests in his training and field experience.  He explained that, during the HGN test, each eye can give three possible indicators that a person might be under the influence of alcohol: "lack of smooth pursuit," "distinct and sustained nystagmus at maximum deviations," and "onset of nystagmus prior to 45 degrees."  A total of four indicators on the HGN test is sufficient to establish that a person might be under the influence of alcohol.  Before administering the test, Bayer asked defendant if he had any medical conditions that might affect his vision.  Defendant said that he had chronic obstructive pulmonary disease (COPD), which might affect his vision.  Bayer instructed defendant on how the test would be performed.  While performing the test, Bayer observed three indicators in each eye, totaling six indicators that defendant might be under the influence of alcohol.  During the HGN test, Bayer continued to smell a strong odor of an alcoholic beverage on defendant's breath.

¶ 10    The next field sobriety test administered by Bayer was the walk-and-turn test.  Bayer testified that there are eight possible indicators to be observed during the test: (1) breaking from the instructional stance, (2) starting before being instructed to do so, (3) using arms to maintain balance, (4) stepping off the line or imaginary line, (5) failing to touch heel to toe, (6) improper number of steps, (7) improper turn, and (8) stopping while walking to regain balance.  According to Bayer, displaying two or more of those indicators establishes that the person might be under the influence of alcohol.

¶ 11    When Bayer asked defendant if he had any physical injuries that might affect the walk-and-turn test, defendant said that he had suffered knee injuries from playing football. Bayer testified that, although defendant's response did not dissuade him from administering the test, he factored it in assessing defendant's performance on the test. Bayer instructed defendant on how to perform the test and demonstrated the entire test. He directed defendant to start with his right heel against his left toe, keep his hands at his sides, take nine heel-to-toe steps on an imaginary line, turn using small steps, and return to the start taking nine more heel-to-toe steps. Bayer also told defendant not to start before being instructed to do so.

¶ 12    According to Bayer, the test provided six of eight of the indicators that defendant might be under the influence of alcohol. Bayer elaborated that defendant started the test before being told to do so, stepped off the imaginary line several times, failed to touch heel to toe when he began walking, performed an improper turn by spinning instead of taking small steps, and, on his return walk, stepped off the imaginary line at step seven. Bayer admitted that his report initially indicated, mistakenly, that defendant had displayed five indicators, but the narrative portion of the report described six indicators.

¶ 13    The next field sobriety test administered by Bayer was the one-leg-stand test. According to Bayer, that test had four possible indicators that a person might be under the influence of alcohol: hopping, swaying, putting the raised foot on the ground, and using arms to maintain balance. Two or more of the indicators would show that the person might be under the influence of alcohol.

¶ 14    Bayer instructed defendant on how to perform the test. Bayer first explained that defendant must keep his arms at his sides, raise either foot six inches off the ground, and hold it for 30 seconds by counting one-one thousand, two-one thousand, etc. Bayer then demonstrated how to perform the test. When defendant tried to do the test, he lifted his foot off the ground several times but put

it back down within a second or two. After several tries, defendant told Bayer that he could not perform the test. Because he was concerned about defendant falling and hurting himself, Bayer told defendant to stop. Bayer did not score the one-leg-stand test but did consider how defendant attempted to perform the test in his overall assessment of whether defendant was under the influence of alcohol.

¶ 15    After defendant completed the field sobriety tests, Bayer again asked him how much he had to drink. Defendant answered that he had two Modelo beers approximately 20 minutes before the stop.

¶ 16    Bayer testified that, while still at the scene, defendant asked if he could take a breath test. Bayer told him he could give a breath sample at the police station. Bayer testified that the Montgomery Police Department had a breath testing machine, which was relatively large and not portable. Bayer did not "have access to that type of machine" in his squad car during the traffic stop; thus, he could not give defendant a breath test at the scene.

¶ 17    Based on all his observations of defendant, including the field sobriety tests, Bayer arrested defendant for DUI and transported him to the Montgomery Police Department. At the police department, Bayer offered defendant the opportunity to take a breath test, but defendant refused. According to Bayer, defendant's breath continued to have a strong odor of an alcoholic beverage while at the police department. Bayer opined that defendant was under the influence of alcohol, because defendant had been driving 14 miles per hour over the posted speed limit, admitted drinking alcohol, had bloodshot and glassy eyes, leaned on his vehicle "a little bit," had a strong odor of an alcoholic beverage on his breath, had performed poorly on the field sobriety tests, and refused to submit to a breath test at the police department.

¶ 18   On cross-examination, Bayer admitted that defendant did not swerve while driving, his wheels did not touch the centerline or fog line, and he turned properly into the parking lot and the parking space. Bayer also admitted that the stop might have been one of his first five DUI stops as "lead investigator." He further admitted that he had no medical training. Bayer also testified that he did not see defendant sway, stumble, or have difficulty walking before the field sobriety tests. Bayer also admitted that, before administering the HGN test, he did not ask defendant any follow-up questions on how his COPD might have affected his vision. According to Bayer, he considered defendant's failed attempts to perform the one-leg-stand test but did not score that test because defendant could not complete it.

¶ 19   Bayer testified that defendant asked twice at the scene to give a breath sample. Defense counsel asked Bayer several questions as to why he did not give defendant a "portable breath test" (PBT) at the scene. Bayer reiterated that his squad was not equipped with a PBT device at the time of the stop. Bayer admitted that a PBT "would give [him] an objective determination *** to make a decision about whether a person might be under the influence[.]" A PBT "takes no interpretation by the officer whether something constitutes a missed heel-to-toe or a step off a line or a proper or improper turn[.]" According to Bayer, he had never administered a PBT, and the Montgomery Police Department "didn't use [PBTs] often."

¶ 20   During the stop, Bayer's squad car was equipped with a video camera, and Bayer wore a body camera. Both cameras were activated and recorded the stop, including the field sobriety tests. Both recordings were played for the jury. Only the body camera video recorded the audio outside the squad car.

¶ 21   On the body camera video, when asked if he has any health issues that might affect the HGN test, defendant answers that he has COPD. Defendant also tells Bayer that he has knee issues

from having played football. The video does not show the reaction of defendant's eyes during the HGN test. The video does show defendant starting the walk-and-turn test before being told to do so, stepping off the imaginary line several times, failing several times to touch heel to toe, and, when turning, spinning instead of taking small steps as instructed. After improperly making the turn, defendant says he is "sorry." Before defendant starts the one-leg-stand test, Bayer asks him if he has any physical issues besides his knees, and defendant says he has ankle problems because he had played running back. The video shows defendant trying to perform the test several times but failing to keep his foot elevated for more than a second or two. After his second failed attempt, defendant says he cannot do it.

¶ 22    Twice during the video, defendant asks Bayer to give him a breath test. Defendant then emphasizes that he is asking for a breath test. When Bayer asks him how much he had to drink, defendant says he had two small cans of Modelo beer.

¶ 23    Bayer admitted that the body camera video did not show him telling defendant that he could give a breath sample later at the police department.

¶ 24    Defendant neither testified nor offered any evidence.

¶ 25    After the close of the evidence, the State sought a nonpattern jury instruction that a PBT result is inadmissible at trial to prove a defendant's blood alcohol content. Defendant objected. The trial court noted that defense counsel, during cross-examination, "emphasized several times why [Bayer] didn't give the defendant a PBT after [defendant] offered it twice." The court concluded that, because defense counsel "crossed with that, to a *** significant amount of [his] questions, *** this is an acceptable [instruction] at this point[.]" Thus, the court agreed to give an instruction on the inadmissibility of a PBT to prove blood alcohol content.

¶ 26    During closing argument, the State told the jury that it would be instructed

"about the [PBT] that was mentioned by the defense in this case, the [PBT] that the Montgomery police officer didn't have. They didn't have those in Montgomery. And that instruction is going to tell you that even if there was a [PBT] in this case, it [is] not admissible. The State could not bring it to trial. So the defense might sit there and say there was no [PBT], but even if there was, you wouldn't be able to hear it today."

¶ 27 During the defense closing, counsel said, "let's get to this [PBT]." Counsel then added that, "The State's right, I belabored that point a little bit during cross examination. And that is also an important piece of evidence." Counsel then noted that Bayer had testified "that [the PBT] was not offered to [defendant] because he—he didn't have one, simply didn't have one to offer." Counsel emphasized that defendant twice offered to provide a breath sample at the scene and was ignored and told that he could give a breath sample at the police department. Counsel further asserted that even though defendant offered to provide a breath sample at the scene, Bayer wanted "him to give a breath sample on [Bayer's] terms."

¶ 28 In rebuttal, the State reiterated that "[e]vidence of a PBT is inadmissible at trial to prove a defendant's blood alcohol content." The State further argued that the defense

"wants to sit up there and question this officer *ad nauseam* and essentially put him on trial for not offering a test that's inadmissible. That, had he offered, you would have heard nothing about. That he couldn't have relied on here in court. That the department didn't give him access to probably for that very reason."

The State then urged the jury not to "pay any attention to that argument."

¶ 29 The trial court instructed the jury, among other things, that "[e]vidence of a PBT (portable breath test) is inadmissible during a trial to prove a defendant's blood alcohol content."

¶ 30    The jury found defendant guilty of all three offenses.  Defendant filed a motion for a judgment notwithstanding the verdict or a new trial.  Defendant challenged the sufficiency of the evidence and the giving of the PBT instruction.  The trial court denied the posttrial motion and sentenced defendant to, among other things, five years in prison for aggravated DUI.  Defendant then filed this timely appeal.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, defendant contends that (1) the State failed to prove beyond a reasonable doubt that he was under the influence of alcohol and (2) the trial court erred in instructing the jury that a PBT result is inadmissible at trial to prove a defendant's blood alcohol content.

¶ 33    We begin with the proper standard of review regarding the sufficiency of the evidence. Defendant, relying on *People v. Kotlinski*, 2011 IL App (2d) 101251, asserts that, because there was undisputed video evidence of the incident, we must apply *de novo* review.  We disagree.  In *Kotlinski*, the defendant, relying on *People v. Smith*, 191 Ill. 2d 408, 411 (2000), argued that *de novo* review should apply because the video established the undisputed facts in the case. *Kotlinski*, 2011 IL App (2d) 101251, ¶ 38.  We rejected that argument because, although the video presented the best evidence of what happened, officer testimony conflicted with the video evidence.  *Kotlinski*, 2011 IL App (2d) 101251, ¶ 38.  In other cases, we have suggested more broadly that *de novo* review is inappropriate whenever both live testimony and video evidence bear on a disputed fact issue.  See *People v. Span*, 2011 IL App (1st) 083037, ¶ 27; *People v. Valle*, 405 Ill. App. 3d 46, 58 (2010).  Here, the videos were not the only evidence on whether defendant was under the influence, as Bayer testified extensively on that matter.  Thus, we decline to review *de novo* whether the evidence was sufficient to prove that defendant was under the influence of alcohol.  We apply, rather, the traditional deferential standard.

¶ 34    In considering a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22.  Under this standard, the reviewing court must allow all reasonable inferences from the record in favor of the prosecution. *People v. Givens*, 237 Ill. 2d 311, 334 (2010).  The reviewing court will not retry the defendant.  *People v. Nere*, 2018 IL 122566, ¶ 69.  The trier of fact is responsible for assessing the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences from the evidence.  *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 102.  We will not substitute our judgment for that of the trier of fact regarding those issues.  *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

¶ 35    The trier of fact need not disregard inferences that flow normally from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.  *People v. Jackson*, 2020 IL 124112, ¶ 70.  A conviction will not be set aside unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of a defendant's guilt.  *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 36    To prove a defendant guilty of DUI, the State must prove beyond a reasonable doubt that the defendant was driving or in actual physical control of a vehicle while under the influence of alcohol.  625 ILCS 5/11-501(a)(2) (West 2020).  Defendant here disputes only whether the State proved he was under the influence.

¶ 37    A defendant is under the influence of alcohol when, as a result of consuming alcohol, his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care to the extent that it renders him incapable of driving safely.  *People v. Groebe*, 2019 IL App

(1st) 180503, ¶ 57.  The State is not required to present scientific proof, such as a breath or blood alcohol test, and may rely entirely on circumstantial evidence.  *Groebe*, 2019 IL App (1st) 180503, ¶ 58.  The testimony of a single, credible police officer can by itself sustain a conviction of DUI. *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 18.  In deciding whether a defendant was under the influence of alcohol, the trier of fact may consider the officer's observations, such as the defendant's conduct, speech, or appearance (*e.g.*, bloodshot or glassy eyes); the odor of alcohol on the defendant's breath; and testimony regarding the defendant's performance on any field sobriety tests.  See *Groebe*, 2019 IL App (1st) 180503, ¶¶ 57-58.  "Any evidence of alcohol consumption is relevant to the issue of impairment."  *Groebe*, 2019 IL App (1st) 180503, ¶ 58.

¶ 38     Here, Bayer testified that he stopped defendant because he was driving 14 miles per hour over the posted speed limit.  Bayer testified that he did not observe defendant driving in any other manner that would indicate that he was impaired.  However, when defendant exited the vehicle, Bayer could smell a strong odor of an alcoholic beverage on defendant's breath.  That odor, Bayer testified, persisted throughout the arrest and booking process.  Further, defendant's eyes were bloodshot and glassy.  According to Bayer, when defendant exited his vehicle, he leaned "slightly" on it as Bayer spoke with him.  However, defendant asserts that the videos do not show defendant leaning on his vehicle.  It is unclear from the videos whether defendant is leaning slightly on his vehicle. Any conflict between the video evidence and Bayer's testimony was a matter for the jury to resolve.  Defendant also told Bayer that he had consumed two beers approximately 20 to 30 minutes before being stopped.  Bayer's testimony regarding his observations of defendant, such as his speeding, his bloodshot and glassy eyes, and a strong odor of an alcoholic beverage on his breath, when viewed in the light most favorable to the prosecution, supported the jury's finding that defendant was under the influence of alcohol.

¶ 39    In addition to those observations, Bayer had defendant perform several field sobriety tests. The first of those was the HGN test.  It is well established that an HGN test, when performed according to protocol by a properly trained officer, is admissible to show whether a defendant has likely consumed alcohol and might be impaired.[1] *People v. Gocmen*, 2018 IL 122388, ¶ 35.  Bayer testified that, during his performance of the HGN test, defendant exhibited six positive indicators (three per eye) that he might be under the influence of alcohol.  According to Bayer, four positive indicators on an HGN test are sufficient to establish that a person might be under the influence of alcohol.  The results of the HGN test certainly supported the jury's conclusion that defendant was under the influence.

¶ 40    Defendant suggests that, because he had COPD that affected his vision, the HGN test results are less reliable.  However, defendant does not explain how any vision problems attributable to his COPD might have impacted the HGN test.  Moreover, Bayer testified that defendant told him that his COPD affected his vision, and thus, it was for the jury to determine how much weight to give to the HGN test results.

¶ 41    Bayer also had defendant perform the walk-and-turn test.  Bayer explained and demonstrated the test for defendant.  According to Bayer, there were eight possible indicators to be observed on the test, and displaying two or more of them would show that the person might be under the influence.  Bayer testified that defendant displayed six of the eight indicators, such as starting the test before being told to do so, stepping off the imaginary line several times, failing to touch heel to toe, and performing an improper turn by spinning instead of taking small steps.  Thus, the walk-and-turn test provided further evidence that defendant was under the influence of alcohol.

---

[1]Defendant does not challenge the admissibility of the HGN test conducted by Bayer.

¶ 42    Defendant suggests that his performance on the walk-and-turn test was hampered by knee injuries he suffered when he played football. Here, too, defendant does not explain exactly how any knee injuries affected his ability to perform the test. More importantly, the jury was aware that defendant had told Bayer about his knee injuries. Thus, the jury was in the best position to consider if defendant's knee injuries impacted the test and to weigh that evidence accordingly.

¶ 43    The final field sobriety test that Bayer had defendant perform was the one-leg-stand test. That test required defendant to stand on one foot and hold his other foot about six inches off the ground for 30 seconds. Defendant tried doing so several times but could not elevate his foot for more than one or two seconds. Eventually, Bayer told defendant to stop trying. Bayer explained that he was afraid that defendant might fall and injure himself.

¶ 44    Bayer testified that the one-leg-stand test had four possible indicators that a person was under the influence: hopping, swaying, putting the raised foot down, and using arms to maintain balance. Because defendant could not elevate his foot for more than a second or two, Bayer could not assess whether any other indicators were present. Bayer did not score the one-leg-stand test but did consider defendant's performance in his overall assessment of whether defendant was under the influence of alcohol. Accordingly, defendant's failed attempts at the one-leg-stand test provide some evidentiary support for the jury's conclusion that defendant was under the influence of alcohol, while perhaps not as much support as defendant's performance on the other tests.

¶ 45    Another piece of evidence showing that defendant was under the influence of alcohol was his refusal to submit to a breath test at the police station. Refusal to take a breath test is circumstantial evidence of a defendant's consciousness of guilt. *People v. Weathersby*, 383 Ill. App. 3d 226, 230 (2008). Defendant asserts, however, that the import of his refusal to take a breath test at the police station was mitigated by his earlier offers to take a breath test at the arrest scene.

Nonetheless, it was the jury's province to consider the refusal as additional evidence that defendant was under the influence of alcohol.

¶ 46    We next address the significance of the video evidence. Defendant asserts that the videos were so inconsistent with Bayer's testimony that they seriously undercut his credibility. We disagree. After carefully reviewing both videos, we cannot say they differ significantly from Bayer's testimony. For instance, the videos show Bayer conducting the HGN test essentially as he described it. As for the walk-and-turn test, the videos show, consistent with Bayer's testimony, that defendant started before being told to do so, stepped off the imaginary line several times, failed to touch heel to toe several times, and spun instead of taking small steps when turning. Likewise, the videos show, similar to Bayer's testimony, that defendant was unable to perform the one-leg-stand test. Further, on the body camera video, defendant asks twice to be given a breath test and tells Bayer that he had drunk two beers before being stopped. Although there are a few minor inconsistencies between Bayer's testimony and the videos, it was entirely up to the jury to reconcile any inconsistencies and weigh the evidence accordingly.

¶ 47    We conclude that there was ample evidence, when viewed in the light most favorable to the State, to establish beyond a reasonable doubt that defendant was under the influence of alcohol.

¶ 48    We next address whether the trial court committed reversible error in instructing the jury that a PBT result is admissible at trial to prove a defendant's blood alcohol content. We determine no error.

¶ 49    "The function of instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can arrive at a correct conclusion according to the law and the evidence." *People v. Fuller*, 205 Ill. 2d 308, 343 (2002). Jury instructions must accurately explain the governing principles of law and not be misleading or confusing. *People v. Jones*, 2015 IL App

(1st) 142597, ¶ 31. Where the trial court determines that the jury requires instruction on an issue for which no Illinois pattern instruction exists, the court may give a nonpattern jury instruction. *People v. Pollock*, 202 Ill. 2d 189, 211 (2002). A nonpattern instruction should be simple, brief, impartial, and free from argument. Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). The decision to give or refuse a nonpattern instruction is well within the trial court's discretion and will not be overturned absent an abuse of discretion. *People v. Nutall*, 312 Ill. App. 3d 620, 633 (2000). We note the general principles for giving jury instructions:

> "The threshold for giving an instruction in a civil case is *** not a high one. Generally speaking, litigants have the right to have the jury instructed on each theory supported by the evidence. Whether the jury would have been persuaded is not the question. All that is required to justify the giving of an instruction is that there be *some evidence* in the record to justify the theory of the instruction. The evidence may be insubstantial." (Emphasis added.) *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007).

A court abuses its discretion if its decision to give an instruction is arbitrary, fanciful, or unreasonable or where the instruction provided is unclear, misleading, or unjustified by the evidence and the law. *People v. Lovejoy*, 235 Ill. 2d 97, 125 (2009).

¶ 50 We begin by noting that the nonpattern instruction on the inadmissibility of a PBT result to prove blood alcohol content was an accurate statement of the law. The trial court instructed the jury that "[e]vidence of a PBT (portable breath test) is inadmissible during a trial to prove a defendant's blood alcohol content." It is well established in Illinois that PBT results are not admissible in the State's case in chief to prove a defendant's intoxication. *People v. Brooks*, 334 Ill. App. 3d 722, 727 (2002). Thus, there is no question that the instruction was an accurate statement of the law. Defendant asserts that the instruction was not complete because it did not

state that a defendant can introduce PBT results at trial. Although a defendant can seek admission of PBT results (see 625 ILCS 5/11-501.5 (West 2020); People v. Rose, 268 Ill. App. 3d 174, 181 (1994)), the State sought the instruction merely for the purpose of advising the jury that the State could not have introduced any PBT evidence regarding blood alcohol content. To that extent, the instruction was accurate, and its utilization was not an abuse of discretion. Blood alcohol content is a quantitative analysis of the relative concentration of alcohol in the blood/breath test.

¶ 51    However, we must further determine whether it was an abuse of discretion to give the instruction under the circumstances of this case. It was not.

¶ 52    Here, a PBT was first mentioned when Bayer testified on direct examination that he did not give defendant a breath test after defendant asked to give one at the scene, because Bayer did not have a PBT available to him. On cross-examination, defendant asked Bayer about why he did not give a breath test at the scene. Bayer explained that he had never administered a PBT and that the Montgomery Police Department did not use them. Bayer admitted, however, that a PBT "would give [him] an objective determination *** to make a decision about whether a person might be under the influence[.]" He also admitted that a PBT "takes no interpretation by the officer whether something constitutes a missed heel-to-toe or a step off a line or a proper or improper turn[.]"

¶ 53    At the jury instructions conference, the State asked that a nonpattern instruction be given to explain to the jury that the results from any PBT were not admissible on behalf of the State to prove blood alcohol content. The trial court—after noting that defendant had emphasized during cross-examination that Bayer did not give a PBT even though defendant had twice asked to give a breath test at the scene—ruled that it would give an instruction on the inadmissibility of a PBT result to prove blood alcohol content.

¶ 54　Defendant's cross-examination clearly placed before the jury the question of why Bayer did not give defendant a breath test at the scene even though defendant had requested to give a breath sample.　In eliciting Bayer's agreement that a PBT is an "objective" test that does not rely on the officer's impressions like certain field sobriety tests, defendant was insinuating that Bayer's investigation was not as thorough and free from subjectivity as it could have been.　The State justifiably asked for an instruction that would counteract that suggestion by clarifying that the investigative means Bayer did not utilize could not have been admitted in any event to prove a DUI charge against defendant.　After closing arguments, in which the admissibility of PBT results to prove blood alcohol content was squarely addressed, the trial court gave the nonpattern instruction, which accurately stated the law and was simple, brief, impartial, and free of argument."

¶ 55　Even if the trial court erred in giving the nonpattern instruction, we would not reverse, because any such error was harmless.　Instructional errors are reviewed under a harmless error analysis.　*People v. Dennis*, 181 Ill. 2d 87, 95 (1998).　The test for harmless error in the context of a jury instruction is whether the trial result would have been different had the jury been properly instructed.　*Dennis*, 181 Ill. 2d at 95; *People v. Martinez*, 389 Ill. App. 3d 413, 416 (2009).　Put another way, if there was error in an instruction, we must then determine whether, despite that error, the evidence of the defendant's guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt.　*Dennis*, 181 Ill. 2d at 96.

¶ 56　Here, had the instruction not been given, the result of the trial would have been the same. As discussed, there was ample evidence of defendant's guilt apart from breath testing or the lack thereof, and there were reasons why such testing was not done in the field.　Thus, any error in giving the nonpattern jury instruction was harmless beyond a reasonable doubt.

¶ 57　　　　　　　　　　　　　　III. CONCLUSION

¶ 58    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 59    Affirmed.